**E-Filed 8/19/2008**

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES EXCHANGE COMMISSION,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>MARK LESLIE, KENNETH E. LONCHAR, PAUL A. SALLABERRY, MICHAEL M. CULLY, and DOUGLAS S. NEWTON,<br><br>　　　　　　　Defendant. | Case Number C 07-3444<br><br>ORDER[1] GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS AND TO STRIKE |

## I. BACKGROUND

The United States Securities Exchange Commission ("SEC") brings this action against Moving Defendants Mark Leslie ("Leslie"), Kenneth Lonchar ("Lonchar"), and Paul Sallaberry ("Sallaberry"), as well as Michael Cully ("Cully") and Douglas Newton ("Newton"). Moving Defendants are former officers and directors of Veritas Software Corporation ("Veritas"), a California corporation with common stock registered with the SEC during the period at issue in

---

[1] This disposition is not designated for publication and may not be cited.

this case.[2]  According to the complaint, Moving Defendants held the following positions: Leslie served as the Chief Executive Officer ("CEO") of Veritas from 1990 to 2000.  He was co-chair of the board of directors from 1997 until 1999, when he became chairman of the board of directors.  He resigned as CEO on December 31, 2000, but continued to serve on the board of directors until May 31, 2004.  Lonchar, a licensed Certified Public Accountant ("CPA"), was Veritas's CEO from April 1997 until October 2002.  Sallaberry was the executive vice president of Worldwide Field Operations for Veritas from January 2000 until January 2003 when he became executive vice president of Sales Strategy.

The complaint alleges the following facts:

### The AOL Transaction

During the summer of 2000, Veritas and America Online ("AOL") began negotiating a license ("the license") for Veritas' software products as well as certain service, consulting and training commitments.  Early in these negotiations, AOL proposed that Veritas purchase online advertising, but Veritas rejected this proposal because it had no budget and no need for advertising.   In September 2000, the parties agreed to a price of $30 million on the license, which represented a discount of sixty-five percent.  According to the complaint, the transaction originally was scheduled to close by the end of the third quarter, but hours before the parties were set to execute the agreement, AOL's lead negotiator telephoned Leslie and asked that Leslie allow AOL to pay an additional $20 million for the license in exchange for Veritas's agreement to purchase a comparable amount of AOL online advertising.  Leslie agreed and directed Sallaberry to contact AOL and negotiate the deal without modifying the agreement in any way that would increase the out-of-pocket expense to Veritas.  Sallaberry contacted a sales executive at AOL to effectuate the agreement.  Lonchar instructed Sallaberry to document the transaction as if it consented to two separately negotiated *bona fide* contracts.  Accordingly, the parties signed two separate agreements: a license agreement that provided for payment within thirty days from the date of invoice  and an advertising agreement that required payment within thirty days

---

[2] Veritas was acquired by Symantec Corporation on July 2, 2005.

of the contract date.  The SEC alleges that despite the language in the agreement, Sallaberry and his AOL counterpart agreed orally to make simultaneous wire payments of the respective amounts due.

The parties do not dispute that on October 2, 2000, Leslie sent an email to Veritas's entire board of directors (including the internal audit committee) stating that "[w]e closed a $30 million deal with AOL (which will be taken to revenue in Q4).  However, at the eleventh hour we got a request from AOL to gross up the deal by $20 million and take back an equal amount of dollars in paid advertising to AOL."  The SEC alleges that in response to this email, Leslie was warned at least twice of the sensitive accounting issue involved in this transaction and was urged to obtain approval from independent auditors.  It also alleges that on December 1, 2000, Sallaberry and Lonchar were told that simultaneous payments had been made, but that Lonchar later booked the entire $50 million as license and service revenue beginning in the fourth quarter of 2000 through 2002.

According to the complaint, independent auditors reviewed the license at least twice: first in December 2000 and again in January 2001.  In 2001, the auditors discovered the concurrent nature of the contracts and thereafter questioned Leslie, Sallaberry and Lonchar.  Finally, the SEC alleges that Lonchar participated in preparing and submitting to Veritas's independent auditors documentation justifying and concealing the true nature of the transaction.  Lonchar allegedly told the auditors that: (1) the license and the advertising contracts were not contingent and were entered into for separate and valid business reasons; (2) the transactions were negotiated separately by executives in different functional organizations within Veritas; (3) the contracts were fairly valued, and Veritas entered into the advertising contract to strengthen brand recognition.  The SEC alleges that, "among other things," Complaint at ¶ 38,  Leslie falsely represented to the auditors that: (1) the contracts were entered into for separate and valid business reasons and were not part of a contingent arrangement; (2) Veritas needed online advertising as apart of a campaign for stronger brand recognition; (3) the contracts were fairly priced.  The SEC asserts that Sallaberry: (1) "provided false and misleading responses" to this line of questioning; (2) "participated in, or at least was aware that others were, altering or withholding documents

1  created contemporaneously with the transaction that described it as a $30 million license . . . and
2  directed the creation of documents to support the $50 million price," *Id.* at ¶ 39; (3) interceded
3  with AOL to obtain a signature on an audit confirmation provided to Veritas's independent
4  auditors; and (4) did not disclose to the auditors that he and his AOL counterpart agreed to make
5  payment under the contracts by simultaneous wire transfers.  The SEC also alleges that the
6  auditors questioned Sallaberry about the sale process preceding the license agreement and the
7  size and scope of the transaction.

8        In January of 2001, Lonchar and Leslie provided the independent auditors with a letter
9  representing that the license and advertising contracts contained all of the terms of those
10 agreements and were not supplemented by other written or oral agreements.  The letter did not
11 characterize the two contracts as contingent, and it reiterated that the contracts had been recorded
12 at fair value within reasonable limits.  The SEC claims that this letter caused the auditors to issue
13 an unqualified audit report with respect to the 2000 financial statements.  In 2001, Leslie and
14 Lonchar signed and approved public disclosure of these financial results, including the 2000
15 Form 10-K.

16       The SEC asserts that Veritas's fourth quarter results of operation were distorted by the
17 artificial inflation of the license price.  Specifically, the SEC alleges that fourth quarter revenues
18 were inflated by $ 19.2 million, representing five percent of total revenues and six percent of
19 license revenues for the quarter, and that the net loss for the fourth quarter was reduced
20 improperly by $8.1 million, representing a six percent understatement.  It alleges that Leslie,
21 Sallaberry and Lonchar profited from the sale of Veritas stock at a price that was inflated by their
22 misstatements with respect to the AOL transaction. On January 17, 2003, Veritas announced that
23 it would restate its disclosures regarding the AOL transaction.

24       Finally, the complaint alleges that Lonchar, Sallaberry and Leslie were "consulted in
25 connection with [Veritas's] efforts to avoid a story about its transaction with AOL," *Id*. at ¶ 78,
26 and that following this consultation Veritas representatives told reporters that the licensing and
27 advertising transactions were not a part of the same deal.  The SEC argues that Lonchar,
28 Sallaberry and Leslie were aware that this response was false and misleading.

Lonchar's Alleged Further Manipulation of Veritas' Financial Statements

The SEC also alleges that Lonchar[3] knowingly directed a scheme consisting of three separate accounting practices that he used to "smooth" Veritas's financial results, each of which violated Generally Accepted Accounting Practices ("GAAP"). These included: (1) use of "accrual wish lists" and "cushion schedules;" (2) improper recognition of professional service revenues; and (3) manipulation of Veritas's deferred revenue balance. According to the complaint, in 2001 and 2002 Lonchar signed two separate representation letters that failed to disclose these non-GAAP accounting practices.[4] The SEC asserts that as a result of these

---

[3] Cully, Douglas and Newton are alleged to have assisted Lonchar.

[4] The SEC alleges that the following false and misleading statements were made in the representation letter dated January 23, 2001:

    i.    the consolidated statements of financial position and results of operations were fairly presented in conformity with GAAP;
    ii.    the un-audited quarterly financial information to be included in the Annual Report to Stockholders was derived from interim financial statements prepared in conformity with GAAP;
    iii.    [Lonchar and Cully] provided the auditors with all financial records and related data;
    iv.    there are no material weaknesses in internal controls;
    v.    [Veritas] has accrued $13,934,404, and $12,771,464 in commissions and bonuses, respectively, as of December 31, 2000 based upon its best estimates of amounts earned in 2000 but to be paid subsequent to December 31, 2000
    vi.    there are no material transactions that have not been properly recorded in the accounting records underlying the financial statements;
    vii.    there has been no fraud involving management or employees who have significant roles in internal control

Complaint at ¶ 75. The SEC alleges that the letter dated January 25, 2002 contained the following false and misleading statements:

    i.    The consolidated financial statements are fairly presented in conformity with GAAP;
    ii.    [Lonchar and Cully] made available to [Veritas's] independent auditors all financial records and data;
    iii.    there have been no: (1) instances of fraud involving management or employees who have significant roles in internal control; (2) allegations, either written or oral, or misstatements or other misapplications of

5

practices Veritas's reported financial results were materially false from 2000 until 2003. Leslie, Sallaberry and Lonchar are alleged to have profited by receiving bonuses based on artificially inflated financial results.

### "Accrual Wish Lists" and "Cushion Schedules"

The SEC claims that Lonchar directed Veritas's quarterly process of closing books and preparing financial statements in an improper manner. According to the complaint, Lonchar adopted the following practices: after accruals had been determined properly, Lonchar requested that the analysts in the finance and operational units submit "accrual wish lists" of additional expenses for possible accrual. Cully and Newton then assessed whether there was room in the budget for these accruals, whether the accruals could be taken as expenses without adversely impacting the earnings, and whether Veritas would benefit in the subsequent quarter by recording these accruals in the current quarter. Lonchar ultimately decided which accruals were to be recorded and then directed his finance team to prepare "cushion schedules" based on these decisions. Cully and Newton assisted in preparing the cushion schedules, which Lonchar allegedly knew were not in conformity with GAAP. The cushion schedules were concealed from the independent auditors. The cumulative balance of over-stated accrued liabilities from 2000 to 2002 is alleged to be in the range of $10 to $21 million. In March 2004, Veritas corrected these accrued liability figures in its restatement ("the 2004 restatement").

---

accounting principles in [Veritas's] consolidated financial statements that have not been disclosed to [Veritas's] independent auditors in writing;
iv.  false statements affecting [Veritas's] consolidated financial statements made to [Veritas's] independent auditors, or other auditors who have audited entities under their control upon whose work [Veritas's] independent auditors may be relying in connection with its audits
v.  The unaudited interim financial information accompanying the consolidated financial statements for the quarters ended March 31, June 30, September 30 and December 31, 2001, was prepared in conformity with GAAP; and
vi.  the accrual of porting services related to the Sun Microsoft OEM arrangement is probable and estimable liability in accordance with SFAS 5, Accounting for Contingencies . . . [T]he assumptions used in developing the accrual are management's best estimates based on the information available

6

### Professional Service Revenue

Veritas's second line of revenue behind software sales was from fees charged for professional services related to the use of its software. Analysts responsible for tracking license to service revenue as a percentage of total revenues each quarter look favorably on higher license-to-service revenues. The SEC alleges that at the beginning of each quarter, Lonchar set targets for reported revenue and instructed the finance department to stop accruing and recognizing professional service revenue on services once these targets were met. The unrecognized earned services revenues were tracked as "carryforward rollforward" schedules. According to the complaint, Lonchar, Cully and Newton knew that these practices did not conform with GAAP, which require companies to recognize service fees at the time they are earned and collectable.[5] The SEC alleges that the 2004 Restatement corrects incorrect revenue reporting but does not identify the quarters for which corrections were made.

### Deferred Revenue Balance

The SEC alleges that in the second quarter of 2002, Lonchar caused Veritas to inflate the deferred revenue reported on its balance sheet by approximately $7 million as follows: Lonchar instructed Newton to direct finance personnel to inflate the deferred revenue balance. Newton allegedly responded by instructing finance personnel not to subtract certain amounts attributable to unpaid contracts. Finance personnel followed these instructions and concealed the practice from the independent auditors by providing them with reconciliation schedules that falsely listed the status of unpaid licenses as paid.[6] At a quarterly review meeting attended by Lonchar, Cully and Newton, the auditors asked whether Veritas wanted to correct its books and financial statements with respect to this purported accidental error, and Lonchar responded that no

---

[5] The complaint also alleges that although Newton told Lonchar in Cully's presence that Lonchar's treatment of the professional service revenues was not proper and Lonchar claimed that he would discontinue this practice, Lonchar, Cully and Newton nonetheless continued to participate in this scheme. The complaint does not allege the date of this interaction. *Id*. at ¶ 62.

[6] The complaint also alleges that when the auditors questioned the schedule and the inflated deferred revenue balance, they were told that the errors in the schedule were inadvertent mistakes. However, the complaint does not attribute this statement to any particular person. *Id*. at ¶ 70.

corrections needed to be made. Lonchar, Cully and Newton did not advise the auditors that there had been any intentional manipulation of the deferred revenue balance. The 2004 restatement adjusts the reported deferred revenue for the second quarter of 2002 by approximately $7 million.

The SEC alleges six claims for relief: (1) fraud in connection with the offer or sale of Veritas stock, in violation of § 17(a) of the Securities Act; (2) fraud in connection with the purchase or sale of Veritas stock, in violation of § 10(b) of the Exchange Act and Exchange Act Rule 10b-5; (3) record-keeping violations of § 13(b)(5) of the Exchange Act and Exchange Act Rule 13b2-1; (4) internal control violations of § 13(b)(5) of the Exchange Act and Exchange Act Rule 13(b)(2)(B); (5) lying to auditors, in violation of Exchange Act Rule 13b2-2; and (6) aiding and abetting reporting violations of §§ 13(a) and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1. With the exception of the fourth claim, which excludes Sallaberry, each of these claims is brought against all of the Moving Defendants. The SEC requests that the Moving Defendants be: (1) permanently enjoined from directly or indirectly violating various provisions of the Exchange Act and Exchange Act Rules;[7] (2) ordered to disgorge ill-gotten gains including pre-judgment and post-judgment interest; (3) ordered to pay a civil penalty; and (4) prohibited from acting as officers or directors of any issuer that has a class of securities registered pursuant to § 12 of the Exchange Act or that is required to file reports pursuant to § 15(d) of the Exchange Act.[8]

Each of the Moving Defendants has filed a separate motion to dismiss. Leslie and Sallaberry also move to strike the requests for punitive relief as time-barred. The SEC opposes all of the motions. The Court heard oral argument on January 18, 2008.

---

[7] The SEC seeks to restrain Defendants from directly or indirectly violating: § 17(a) of the Securities act, § 10(b) of the Exchange Act and Exchange Act Rule 10b-5; Exchange Act Rules 13b2-1 and 13b2-2; §§ 13(b)(5) and 13(b)(2)(B) of the Exchange Act and; §§ 13(a) and 13(b)(2)(A) of the Exchange Act Rules 12b-20, 13a-1, 13a-11 and 12a-13.

[8] The SEC also requests that the Court grant such other relief as it deems just and appropriate.

## II.  LEGAL STANDARD

For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).  Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment.  *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995).  When amendment would be futile, however, dismissal may be ordered with prejudice.  *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

The parties dispute the pleading requirements of a fraud claim.  Fraud claims asserted in federal court must comply with the requirements of Federal Rule of Civil Procedure 9(b), which provides that allegations of fraud must be stated with particularity.  Fed.R.Civ.P. 9(b).  In order to satisfy this requirement the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading.  *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1548 (9th Cir. 1994).  The defendant's scienter, or knowledge of falsity, may be alleged in conclusory fashion.  *Id.*  In the instant case Rule 9(b) applies to all of the claims in the complaint because each requires the SEC to prove fraud as an element and each of the allegations supporting these claims "sounds" in fraud.  *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996).

## III.  DISCUSSION

1.  First and Second Claims

"The elements of liability for violations of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 . . . are the following: (1) a misrepresentation or omission (where a duty to speak exists); (2) of material fact; (3) made with scienter; and (4) made in connection with the sale or purchase of securities."  *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992).  "Under Rule 9(b), the complaint must allege specific facts regarding the fraudulent representation, how or why the representation was false or misleading and, in some cases, the identity of the person engaged in the fraud."  *In re Metricom Sec. Litig.*, No. C01-4085 PJH, 2004 WL 966291 at *8 (N.D. Cal. Apr. 29, 2004).

Each of the Moving Defendants asserts that the first two claims of the complaint should be dismissed because the SEC has not alleged adequately that false statements were made. However, both Lonchar and Leslie cherry-pick elements of the complaint and ignore certain key allegations.[9] The operative complaint contains the following allegations: (1) Lonchar told Sallaberry to document the transaction as if it were two separately negotiated, *bona fide* contracts, Complaint at ¶ 23, 25; and (2) Leslie and Lonchar signed and submitted a representation letter that did not disclose the contingent nature of the transaction. *Id*. at ¶ 47. The SEC claims that these statements are false and misleading because the AOL transaction was a "round-trip" transaction that involved parties entering into a reciprocal arrangement to exchange similar amounts of money for services.[10] These allegations satisfy the requirements of Rule 9(b) that the complaint allege the time, place and nature of the misleading statements. *See Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994).

The allegations against Sallaberry also satisfy Rule 9(b). The SEC alleges that during a meeting held in January 2001 with the independent auditors, Sallaberry: (1) falsely represented to the independent auditors that the software sales transaction was not contingent on the advertising arrangement, Complaint at ¶ 41; (2) concealed the contingent nature of the transaction by falsely

---

[9] Lonchar challenges the SEC's allegations that he: (1) approved the 2000 10-K public disclosure of financial results which were based on treatment of the AOL transaction as two separate contracts; and (2) approved false and misleading press releases and participated in earning release teleconferences with analysts in which false and misleading disclosures were made. Lonchar argues that these allegations are insufficient because they do not identify the dates and substance of the misrepresentations. Leslie focuses exclusively on the 2000 10-K, asserting that "nowhere does the SEC allege with requisite particularity *why* or *how* the financial statements in the 2000 10-K or other filings were false, or even which specific statements in which financial reports were allegedly false." Leslie's Motion to Dismiss at 9.

[10] Lonchar argues that the SEC's pejorative characterization of the AOL transaction is insufficient to support an allegation that the statements are false. In deciding a motion to dismiss, "the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot be reasonably drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994). However, the SEC's assertion regarding the AOL transaction does not rest solely on this statement. To the contrary, the SEC has alleged numerous specific facts in connection with the contingent negotiation of the license and advertising agreements.

representing that the marketing department negotiated the advertising deal; (3) did not disclose the last minute negotiations which resulted in the $20 million inflation of the license; and (4) did not disclose the simultaneous wire transfer.[11]

Relying heavily on cases involving the Private Securities Litigation Reform Act ("PSLRA") and Second Circuit law, each of the Moving Defendants argues that the SEC has not pled facts sufficient to support an inference of scienter. However, the Ninth Circuit has adopted a rather lenient scienter standard in cases brought by the SEC. In the seminal case *In re GlenFed*, the Court declined to adopt the Second Circuit's view that plaintiffs must plead facts giving rise to a strong inference of fraudulent intent and also rejected the "some inference" test proposed by the defendants in that case. Instead, the Ninth Circuit "conclud[ed] that plaintiffs may aver scienter generally, just as the rule states–that is, simply by saying that scienter existed." *In re GlenFed*, 42 F.3d at 1546. It is true that with respect to private litigation, "[t]he PSLRA effectively overturned the Ninth Circuit's lenient scienter pleading requirement enunciated in *In re GlenFed*." *Powers v. Eichen*, 977 F.Supp. 1031 (S.D. Cal. 1997). However, the PSLRA does not apply to actions brought by the SEC. *See SEC v. ICN Pharms. Inc.*, 84 F. Supp. 2d 1097, 1099 (C.D. Cal. 2000) ("Defendant incorrectly argues that the heightened standard of the [PSLRA] . . . should be applied and that the SEC therefore has failed to plead specific facts creating a strong inference of scienter . . . the more rigorous pleading requirements under the PSLRA, which go beyond the Rule 9(b) requirements . . . do not apply to a case . . . brought by the SEC.").

Moving Defendants do not dispute that the SEC has alleged, generally, that each of the alleged false statements was knowingly made. Indeed, the complaint states plainly that "Leslie, Sallaberry and Lonchar each knowingly failed to inform the independent auditors of the true, contingent nature of the AOL contracts." Complaint at ¶ 33. The SEC alleges specifically that (1) Leslie was aware of the contingent nature of the AOL transaction and was warned that it

---

[11] Sallaberry also argues that the third claim against him should be dismissed for this reason. Because Sallaberry's argument with respect to the third claim does not raise any independent issues, the Court concludes that the third also is sufficiently plead.

raised a "sensitive" accounting issue and yet he continued to make statements that the license and advertising agreements were independent of one another; (2) an AOL sales executive informed Sallaberry of the details of the transaction prior to the execution of the agreements; and (3) Lonchar knowingly implemented practices that lead to the improper recording of accruals, improper recognition of professional revenue; and the manipulation of deferred balance revenues before signing representation letters stating that Veritas's financial statements were prepared in conformity with GAAP. These allegations support the inference that Leslie and Sallaberry knew of the allegedly contingent nature of the AOL transaction and that Lonchar knowingly failed to comply with GAAP.

Finally, Leslie challenges the materiality of the misstatements made in connection with the AOL transaction. Materiality is a mixed question of law and fact that ordinarily is best resolved by juries and therefore typically not a matter for Rule 12(b)(6) dismissal. *See SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (reasoning that materiality "should ordinarily be left to the trier of fact"); *Fetch v. Price Co.*, 70 F.3d 1078, 1080-82 (9th Cir. 1995) ("Whether an omission is material is a determination that requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the tried of fact." (internal quotations omitted)). *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994) ("Materiality is a fact specific issue which should ordinarily be left to the trier of fact."). Only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law. *Fecht*, 70 F.3d at 1081.

In the instant case, the SEC alleges that Veritas restated its financial statements to reverse $20 million of improperly recognized revenue from the AOL transaction and correct the related overstated expenses, Complaint at ¶ 51, and further, that the inflated price of the license materially distorted Veritas's fourth quarter 2000 results of operations by five percent of total revenues and six percent of license revenues, and the net loss for the fourth quarter was improperly reduced by $8.1 million, representing a six percent understatement. *Id*. Leslie challenges these figures and estimates that the distortion was smaller, but factual arguments

1  generally are improper in the context of a Rule 12(b)(6) motion. The Court concludes that the
2  SEC has sufficiently pled the materiality of the financial results of the AOL transaction.
3       For the foregoing reasons, Moving Defendants' motions to dismiss the first and second
4  claims will be denied.

5       2.     Third and Fifth Claims

6       Lonchar and Leslie argue that the third claim of the complaint should be dismissed on the
7  ground that the SEC has not met its pleading requirement with respect to scienter. The SEC
8  asserts that there is no scienter requirement for this claim. The Ninth Circuit has explained that
9  "[a] plain reading of section 13(b) reveals that it . . . does not impose a scienter requirement."
10 *See, e.g.*, *Ponce v. SEC*, 345 F.3d 722, 737 n.10; *see also SEC v. McNutty*, 137 F.3d 732, 743 (2d
11 Cir. 1998). Accordingly, the motions to dismiss will be denied as to the third claim. However,
12 the Ninth Circuit has not addressed squarely the issue of whether scienter must be pled as an
13 element of a claim brought pursuant to Section 13(b)(5), which provides that "[n]o person shall .
14 . . *knowingly* falsify any book, record, or account described in [Section 13(b)(2)]." (emphasis
15 added). Because the plain language of this provision indicates that scienter is required, the fifth
16 claim will be dismissed with leave to amend.

17      3.     Aiding and Abetting

18      The SEC asserts two aiding and abetting claims: the fourth claim alleges that Lonchar
19 aided and abetted internal control violations, and the sixth claim alleges that Leslie, Lonchar and
20 Sallaberry aided and abetted reporting violations. The elements of an aiding and abetting
21 violation are: (1) the existence of an outside primary violation; (2) actual knowledge by the aider
22 and abetter of the primary violation and of his own role in furthering it; and (3) "substantial
23 assistance in the commission of the primary violation. *SEC v. Fehn*, 97 F.3d 1276, 1288 (9th
24 Cir. 1996). Each of the Moving Defendants argues that the SEC has not adequately alleged any
25 of these required elements.
26      As explained in the foregoing discussion, the SEC has adequately pled both the existence
27
28

of a primary violation[12] and that the Moving Defendants knowingly made statements or omissions in connection with that violation.  The SEC also has adequately alleged internal control violations: the complaint alleges that Lonchar knowingly circumvented or knowingly failed to implement a system of internal accounting controls to prevent the improper recording of accruals, the improper recognition of professional revenue and the manipulation of deferred balance revenues.

The Second Circuit has explained that "substantial assistance might include repeating misrepresentations (or aiding in their preparation) by acting as conduits to accumulate or distribute securities, by executing transactions or investing proceeds, or perhaps by financing transactions." *Ruff v. Blythe, Eastman, Dillon & Co.*, 570 F.2d 38, 48 (2d Cir. 1978) (quoting 2 A. Bromberg, Securities Law s 8.5 (515) (1974)).  Applying this standard, the SEC has adequately pled that the Leslie and Sallaberry substantially assisted in the internal control and reporting violations: the operative complaint contains allegations that Leslie directed Sallaberry in negotiating and confirming the AOL transaction, and that Lonchar consulted with Leslie and Sallaberry prior to the affirmation of the transaction.

However, the complaint contains only one statement regarding Lonchar's involvement in facilitating the AOL transaction.  The SEC alleges that "after consulting with Lonchar and Leslie Sallaberry affirmed the AOL proposal." Complaint at ¶ 23.   Because this allegation is insufficient to establish that Lonchar was responsible for executing the transaction, the fourth claim will be dismissed as to him with leave to amend.  As to the sixth claim, the SEC has adequately alleged that  between 2000 and 2002 Lonchar aided in the preparation of financial statements that violated reporting requirements.

---

[12] In connection with the sixth claim,  Leslie and Sallaberry focus on the SEC's failure to allege adequately a primary violation by Veritas relating to the reporting of the AOL transaction.  However, the complaint alleges expressly that: in 2000, Veritas artificially inflated reported revenues by approximately $20 million in connection with the AOL transaction causing a material distortion of Veritas's fourth quarter of operations, and that Veritas reported materially false and misleading financial results in periodic reports filed with the SEC and other public statements from at least 2000 through 2003 and its January 28, 2004 earnings release of fourth quarter and annual results for 2003.

4.     Remedies

Leslie and Lonchar move to strike all of the punitive remedies sought by the SEC with the exception of disgorgement and injunctive relief on the ground that, under 28 U.S.C. § 2462, such remedies are time-barred. Sallaberry also moves to strike the SEC's request that the Defendants be permanently enjoined from directly or indirectly violating various provisions of the Exchange Act and Exchange Act Rules.

Rule 12(f) provides that a motion may be brought to strike from a pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. Pro. 12(f). To be immaterial or impertinent, the challenged material must have "no possible bearing on the controversy." *Employers Ins. v. Musick, Peeler & Garrett*, 871 F. Supp. 381, 391 (S.D. Cal. 1994). "A Rule 12(f) motion may be used to strike a prayer for relief when the damages sought are not recoverable as a matter of law." *Wells v. Bd. of Trs. Of the Cal. State Univ.*, 393 F. Supp. 2d 990, 994-94 (N.D. Ca. 2005). The SEC argues that a 12(f) motion is not the proper vehicle for considering the availability of these remedies here because "in the context of SEC enforcement actions, courts have held that motions to dismiss remedies are premature as liability has not yet been established." Opposition at 53. This argument is unpersuasive, because the Court need not consider liability in order to decide whether the specific remedies at issue here are time-barred.

The SEC also contends that the motion to strike should not be granted because: (1) 28 U.S.C. § 2462 does not apply to SEC actions; and (2) the question of when each of the Moving Defendants committed the last violation charged in the complaint involves difficult and disputed legal and factual issues. 28 U.S.C.§ 2462 "is a general statute of limitations, applicable . . . to the entire federal government in civil penalty cases, unless Congress specifically provides otherwise." *3M Co. v. Browner*, 17 F.3d 1453, 1461 (D.C. Cir. 1994). An action seeking civil penalties under § 2462 "shall not be entertained unless commenced within five years from the date when the claim first accrued." 28 U.S.C. § 2462. The SEC cites *SEC v. Rind*, 991 F.2d 1486, 1491-93 (9th Cir. 1993), for the proposition that actions brought by the SEC are not subject to § 2462. However, *Rind* holds only that no statute of limitations applies to

enforcement actions for *injunctive relief*. *Id*. at 1492; *see also sec v. Tandem Mgmt. Inc.*, No. 95 Civ. 8411 JGK, 2001 WL 1488218 at *2 fn.6 (S.D.N.Y. 2001) (recognizing the limited nature of *Rind*'s holding). In accordance with *Rind*, the Court concludes that § 2462 does apply to SEC actions, but cannot be invoked to strike a claim for injunctive relief. Accordingly, Sallaberry's request that the permanent injunction against Exchange Act and Exchange Rule violations be stricken from the complaint will be denied.

Under § 2462, a claim accrues on the date that a defendant allegedly violated the statute and not on the date plaintiff discovered, or should have discovered, the alleged violation.[13] The SEC argues that it has pled securities law violations with respect to each of the Moving Defendants through the year 2003 because Veritas continued to publish false and misleading financial results until that year and it was not until that year Veritas announced that it was restating its 2000 and 2001 financial statements. The thrust of this argument is that Moving Defendants' continued concealment constituted a continuing violation.

Assuming that a continuing violation theory is applicable here,[14] it may not be predicated on the continuing ill-effects of the original violation; rather, it requires continued unlawful acts. Here, the latest unlawful act alleged in the complaint with respect to the AOL transaction occurred in 2000 and 2001, when Veritas initially booked the transaction and when it first

---

[13] In a footnote, the SEC asserts that § 2462's statute of limitations runs from the date of discovery. In *FEC v. Williams*, 104 F.3d 237 (9th Cir. 1980), the Ninth Circuit rejected the FEC's contention that the discovery rule applied to § 2462 and adopted a "date of violation" standard for accrual. *Id*. at 240. Accordingly, a claim accrues on the date the defendant allegedly violated the statue. *See 3M Co.*, 17 F.3d at 1461. The SEC contends that because the Ninth Circuit was not considering the accrual date under § 2462 in the securities fraud context, *Williams* is not controlling. In reaching its decision, the *Williams* Court followed *3M Co. v. Browner* which not only involved a securities action but also states generally that the discovery rule is "unworkable, outside the language of the statue, inconsistent with judicial interpretations of § 2462 . . . and incompatible with the functions served by the statue of limitations in penalty cases." *3M Co., 17 F*.3d at 1460. Numerous other courts have come to this conclusion in the securities context. *See, e.g.*, *SEC v. Jones*, 2006 U.S. Dist. LEXIS 22800 at *15 (S.D.N.Y. 2006) (finding *3M Co.* instructive); *SEC v. Scrushy*, 2006 U.S. Dist. LEXIS 30553 at *8-9 (N.D. Ala. 2005).

[14] The applicability of the continuing violation doctrine has been questioned in the context of § 2462. *See Jones*, 2006 U.S. Dist. LEXIS at *12.

1  published financial statements reflecting the improperly booked transactions.  Later financials
2  reflecting the improperly booked transactions are simply a continuing ill-effect of the initial
3  alleged violation and do not constitute separate violations. *In re Atmel Corp. Derivitive Litig.*,
4  No. CV 04-1566 ST, 2006 U.S. Dist. LEXIS 54058 at *20-22 (N.D. Cal. July 16, 2007).
5  Accordingly, Leslie and Sallaberry's motions to strike the requested punitive relief will be
6  granted, with leave to amend.

7     However, the allegations regarding Lonchar's improper financial reporting date beyond
8  2001.  The SEC alleges that on August 13, 2002, Lonchar falsely verified the accuracy of
9  Veritas' annual statements and its interim financial statements for the quarter ending June 30,
10 2002, when he either knew or was reckless in not knowing that the financial statements were not
11 in conformity with GAAP.  Complaint at ¶ 80.  Because this violation clearly is within the
12 statutory period, the claims for punitive relief against Lonchar will remain in the complaint.

### IV.  ORDER

14    Good cause therefor appearing, IT IS HEREBY ORDERED that the motions are granted
15 in part and denied in part as set forth above.  Any amended complaint shall be filed within thirty
16 (30) days of the date of this order.

18 DATED: August 19, 2008

JEREMY FOGEL
United States District Judge

Case No. C 07-3444
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS AND STRIKE
(JFLC1)

This Order has been served upon the following persons:

Richard Hong  hongr@sec.gov

Jeffrey b. Finnell       finnellj@sec.gov

Melissa A. Robertson  robertsonm@sec.gov

Scott W. Friestad      friestads@sec.gov

Douglas R. Young      dyoung@fbm.com

William Patrick Keane      wkeane@fbm.com

Anthony Paul Schoenberg      aschenberg@fbm.com

Diane Resley  sresley@orrick.com

Greg Farano    gfarano@sflaw.com

John Williams       jlwesq@gatespeed.com

Jahan Pierre Raissi       jraissi@sflaw.com