**E-Filed 7/29/2010**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>    v.<br><br>MARK LESLIE, et al.,<br><br>                    Defendants. | Case Number C 07-3444<br><br>ORDER[1](1) DENYING MOTION TO SEVER; (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY; (3) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT; AND (4) GRANTING SUMMARY JUDGMENT IN FAVOR OF LONCHAR AND SALLABERRY WITH RESPECT TO THE SEC'S REQUEST FOR DISGORGEMENT<br><br>[re doc. nos. 183, 186, 191, 192, 197, 200, and 206] |

The United States Securities Exchange Commission ("SEC") brings this civil action

against Defendants Mark Leslie ("Leslie"), Kenneth Lonchar ("Lonchar"), and Paul Sallaberry

---

[1] This disposition is not designated for publication in the official reports.

("Sallaberry").[2]  Defendants are former officers, directors, or executives of Veritas Software

Corporation ("Veritas"), a California corporation with common stock registered with the SEC

during the period at issue herein.[3]  The SEC asserts six claims for relief: (1) fraud in connection

with the offer or sale of Veritas stock, in violation of § 17(a) of the Securities Act;[4] (2) fraud in

connection with the purchase or sale of Veritas stock, in violation of § 10(b) of the Exchange Act

and Exchange Act Rule 10b-5;[5] (3) record-keeping violations of § 13(b)(5) of the Exchange Act

and Exchange Act Rule 13b2-1;[6] (4) internal control violations of § 13(b)(5) of the Exchange Act

and Exchange Act Rule 13(b)(2)(B);[7] (5) lying to auditors, in violation of Exchange Act Rule

13b2-2;[8] and (6) aiding and abetting reporting violations of §§ 13(a) and 13(b)(2)(A) of the

Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1.  With the

exception of the fourth claim, which is asserted against Lonchar only, each of these claims is

brought against all Defendants.

The SEC seeks an order that Defendants be: (1)  permanently enjoined from directly or

indirectly violating various provisions of the Exchange Act and Exchange Act Rules;[9] (2) ordered

---

[2] Michael Cully and Douglas Newton, who were named in the SEC's original complaint, have settled and no longer are parties to this action.

[3] Veritas was acquired by Symantec Corporation on July 2, 2005.

[4] 15 U.S.C. § 77q(a) (Securities Act Section 17(a)).

[5] 15 U.S.C. § 78j(b) (Exchange Act Section 10(b)) and 17 C.F.R. § 240.10b-5 (Exchange Act Rule 10b-5).

[6] 15 U.S.C. § 78m(b)(5) (Exchange Act Section 13(b)(5)) and 17 C.F.R. § 240.13b2-1 (Exchange Act Rule 13b2-1).

[7] 15U.S.C. § 78m(b)(5) (Exchange Act Section 13(b)(5)).  The SEC also alleges that Lonchar aided and abetted violations of 15 U.S.C. § 78m(b)(2)(B) (Exchange Act Section 13(b)(2)(B)).

[8] 17 C.F.R. § 240.13b2-2 (Exchange Act Rule 13b2-2)

[9] The SEC also seeks to restrain Defendants from directly or indirectly violating: § 17(a) of the Securities act; § 10(b) of the Exchange Act and Exchange Act Rule 10b-5; Exchange Act Rules 13b2-1 and 13b2-2; §§ 13(b)(5) and 13(b)(2)(B) of the Exchange Act; and §§ 13(a) and

2

1  to disgorge ill-gotten gains including pre-judgment and post-judgment interest; (3) ordered to pay

2  a civil penalty; and (4) prohibited from acting as officers or directors of any issuer that has a class

3  of securities registered pursuant to § 12 of the Exchange Act or that is required to file reports

4  pursuant to § 15(d) of the Exchange Act.[10]

5       Each defendant has filed a separate motion for summary judgment or partial summary

6  judgment.  Leslie moves to sever certain claims alleged against Lonchar only.  Lonchar and

7  Sallaberry move to exclude the testimony of the SEC's experts.  The SEC opposes all of the

8  motions.  The Court heard oral argument on March 11, 2010.

9                                   **I. BACKGROUND**

10      Unless otherwise indicated, the following facts are undisputed for the purpose of the

11  instant motions.  Disputed facts will be identified as is relevant.

12  **A.   Defendants' job titles**

13      Leslie served as the Chief Executive Officer ("CEO") of Veritas from 1990 to 2000.  He

14  was co-chairman of the board of directors from 1997 until 1999, when he became chairman.  He

15  resigned as CEO on December 31, 2000, but continued to serve on the board of directors until

16  May 31, 2004.  Lonchar, a Certified Public Accountant, was the Chief Financial Officer ("CFO")

17  of Veritas from April 1997 until October 2002.  Sallaberry was the executive vice president of

18  worldwide field operations for Veritas from January 2000 until January 2003, when he became

19  executive vice president of sales strategy.

20  **B.   The AOL transaction**

21      Defendants are alleged to have violated securities laws by misrepresenting the nature of a

22  business transaction between Veritas and America Online ("AOL").  During the summer of 2000,

23  Veritas and AOL began negotiating a license for Veritas software products ("the license") as well

24  as certain service, consulting and training commitments.  Initially, Veritas offered AOL a license

25

26  13(b)(2)(A) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 12a-13.

27       [10] The SEC also requests that the Court grant such other relief as it deems just and

28  appropriate.

for a fee of $64 million.  Early in these negotiations, AOL proposed that Veritas purchase online

advertising, but Veritas declined.  In September 2000, the parties agreed to a fee of $30 million

for the license.  At that price, the license would have been the largest transaction in the history of

Veritas.  On September 29, 2000, after AOL had signed the agreement but before the agreement

had been signed by Veritas, AOL's Terry Laber called Leslie to propose changes to the license

and a new advertising agreement.  Leslie directed Sallaberry to call AOL's Jay Rappaport to

address Laber's latest proposals.  Rappaport and Sallaberry negotiated a $20 million increase in

the price of the license, bringing the total price to $50 million.  They also negotiated an

arrangement whereby Veritas would purchase $20 million of AOL's online-advertising services.

Leslie, Sallaberry, and Lonchar discussed the agreement, and Lonchar directed Sallaberry to

document the transactions in two separate contracts.  Following this discussion with Lonchar,

Sallaberry signed both contracts (collectively, "the AOL transaction").  The license provided for

payment within thirty days from the date of invoice, and the advertising agreement required

payment within thirty days of the contract date.  Sallaberry and AOL agreed orally that the

payments would be made simultaneously.  On December 1, 2000, both AOL and Veritas made

their respective payments for the license and the advertising purchase.  Lonchar later booked the

bulk of the $50 million as revenue beginning in the fourth quarter of 2000, recognizing the rest of

the payment as service revenue from the fourth quarter of 2000 through 2002.

On October 2, 2000, Leslie sent an email to the entire membership of Veritas's board of

directors (including the internal audit committee) stating that, "We closed a $30 million deal with

AOL (which will be taken to revenue in Q4).  However, at the eleventh hour we got a request

from AOL to gross up the deal by $20 million and take back an equal amount of dollars in paid

advertising to AOL."  In response to that email, Steven Brooks, a member of the board of

directors and audit committee chairman, sent an email to Leslie, stating that, "[O]n the AOL deal,

can we make doubly sure that EY [Ernst & Young] are on board with our revenue recognition in

the barter context?  A fair amount of SEC controversy surrounds the topic."  Brooks

subsequently sent Leslie a second email concerning the revenue recognition of "the recent large

transaction," and Leslie forwarded this email to Lonchar.  The email discussed the "two separate

4

1  transactions notion," and stated "It will not hurt to be extra cautious, since as you know better

2  than I, a single revenue recognition taint can utterly destroy a stock."

3        In December 2000, independent auditors from Ernst & Young reviewed the AOL

4  licensing agreement.  In January 2001, upon learning that the licensing agreement and the

5  advertising purchase had been signed on the same day, the auditors reviewed the AOL

6  transaction a second time.  The auditors interviewed Leslie, Lonchar, and Sallaberry, seeking

7  further information.  Sallaberry directed his department to prepare documentation for Ernst &

8  Young to support the value of the license.  Leslie and Lonchar signed a management

9  representation letter concerning the accuracy of the information provided to Ernst & Young.

10  Following the audit, Ernst & Young provided an unqualified audit report with respect to the 2000

11  financial statements.  In 2001, Leslie and Lonchar signed and approved public disclosure of these

12  financial results, including the 2000 Form 10-K.

13        In 2002, auditors from Ernst & Young reviewed the AOL transaction a third time because

14  the auditors discovered that the price of the license had increased by $20 million on the day the

15  agreement was signed.  As a result of this review, Ernst & Young indicated that it would

16  withdraw its earlier unqualified audit report unless Veritas restated the financials related to the

17  AOL transaction.  On November 15, 2002, Veritas disclosed that the SEC had subpoenaed its

18  records related to the AOL transaction.  On January 17, 2003, Veritas announced that it would

19  restate its financial disclosures for the license agreement and the advertising purchase (the "2003

20  restatement").  Between September 29, 2000 and January 17, 2003, Defendants sold shares of

21  Veritas on the open market.

22        The SEC also alleges that Lonchar engaged in "smoothing violations" relating to

23  Veritas's financials that resulted in a financial restatement in 2004 ("the 2004 restatement").

24  Because Lonchar moves for partial summary judgment only with respect to the claims related to

25  the AOL transaction, the facts related to the "smoothing violations" need not be discussed here.

26                          **II.  MOTION TO SEVER**

27        Leslie moves pursuant to Fed. R. Civ. P. 21 to sever the claims relating to the AOL

28  transaction from the claims related to the 2004 restatement.  Sallaberry and Lonchar join in the

1    motion.

2    **A.    Legal standard**

3    The "determination of a Rule 21(b) motion involves the sound discretion of the trial court

4    . . . ." *United States v. Testa*, 548 F.2d 847, 856 (9th Cir. 1977).  *See also Rice v. Sunrise*

5    *Express, Inc.*, 209 F.3d 1008, 1016 (7th Cir. 2000) (citing *Hebel v. Ebersole*, 543 F.2d 14, 17

6    (7th Cir. 1976); *United States v. O'Neil*, 709 F.2d 361, 367 (5th Cir. 1983)) ("It is within the

7    district court's broad discretion whether to sever a claim under Rule 21.").  "As long as there is a

8    discrete and separate claim, the district court may exercise its discretion and sever it."  *Rice*, 209

9    F.3d at 1016.  However, "an attempt to separate an essentially unitary problem" is an "abuse of

10   discretion."  *Spencer, White & Prentis, Inc. v. Pfizer, Inc.*, 498 F.2d 358, 362 (2d Cir. 1974).

11   The application of Rule 21 involves considerations of convenience and fairness.  It also

12   "presupposes basic conditions of separability in law and logic."  *Id.*  "[T]he Court will consider

13   the following factors in making such a decision: (1) whether the claims arise out of the same

14   transaction or occurrence; (2)  whether the claims present some common questions of law or fact;

15   (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether

16   prejudice would be avoided if severance were granted; and (5) whether different witnesses and

17   documentary proof are required for the separate claims."  *Morris v. Northrop Grumman Corp.*,

18   37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999).  In addition, "the court typically will deny a request

19   that comes so late in the litigation that it will delay the case or prejudice any of the parties to the

20   action." *City of Syracuse v. Onondaga County*, 464 F.3d 297, 308 (2d Cir. 2006) (citing to 7

21   WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE §1688.1 at 510 (West 2001)).

22   **B.    Unitary problem**

23   The SEC contends that severance would be an abuse of discretion because the two sets of

24   allegations represent a "unitary problem."  However, the instant case is unlike *Spencer*.  That

25   case involved a contract dispute in which the defendant counterclaimed under the same contract

26   that underpinned the plaintiff's claims.  Resolution of the claim and the counterclaim required

27   interpretation of the same contract, and the success of one party's claim would necessitate the

28   failure of the other party's claim.  Under the circumstances, the Second Circuit found that

6

1    severing the claims from the counterclaim was an abuse of discretion.  Here, as discussed below,

2    the claims related to the AOL transaction can be resolved in their entirety without affecting the

3    2004 restatement claims.

4    **C.      Whether the claims arise out of the same transaction or occurrence**

5            The SEC's complaint involves allegations relating to a transaction with AOL as well as

6    allegations relating to the 2004 restatement of Veritas's public financial statements.  In

7    connection with the AOL transaction, all Defendants are alleged to have violated securities laws

8    by misrepresenting the nature of the transaction.  With respect to the 2004 restatement, only

9    Lonchar is alleged to have violated securities laws.

10           The SEC's basic allegations relating to the AOL transaction are as follows: all

11   Defendants either were intimately involved in creating the transaction or at least knew all its

12   details of the deal by October 2000.  In January 2001, all Defendants had discussions with

13   Veritas's outside auditors regarding the transaction, and all Defendants intentionally or recklessly

14   provided the auditors with misleading statements or complete misstatements.  As a result of the

15   information  provided by Defendants, the auditors improperly accounted for $20 million in

16   revenue for the transaction, which artificially inflated Veritas's stock price.

17           The SEC's basic allegations relating to the 2004 restatement are as follows: Lonchar

18   "smoothed" Veritas's financials for the years 2000 to 2003 by manipulating the accrued liability

19   balances, recognizing revenue from professional services after the revenue had been earned, and

20   by artificially inflating deferred revenue figures.  The SEC does not allege that Leslie or

21   Sallaberry was involved in this conduct.

22   **D.      Common questions of law or fact**

23           The factual issues relating to the two sets of claims are not common, and the factual

24   allegations concerning the AOL transaction do not overlap with the allegations concerning the

25   2004 restatement.  The accounting rules that govern the AOL transaction and the rules that

26   govern the conduct underlying the 2004 restatement also have little overlap, except for basic

27   accounting fundamentals.  The SEC argues that the legal issues largely are common because it

28   alleges that Lonchar's conduct related to the 2004 restatement violated five of the same statutes

7

1  that all three defendants allegedly violated in connection with the AOL transaction.  However,

2  this is not the type of legal overlap about which the Court typically would be concerned: the

3  factual predicates underlying the violations are different, and the Court will not be required to

4  resolve significant questions of law in isolation from those facts.

5  **E.    Whether settlement of the claims or judicial economy would be facilitated**

6       Lonchar contends that severance will facilitate settlement; however, he bases that

7  contention on his opinion that the 2004 restatement claims are weak and by alluding to his hope

8  that the SEC will not pursue those claims if severance is granted.  The SEC disputes both of

9  Lonchar's contentions, and the Court has considerable doubt that severance will increase the

10  chance of settlement in this long-running and bitterly contested litigation.

11       As to judicial economy, severance certainly would shorten the time in trial for Leslie and

12  Sallaberry, but it likely would lengthen the time in trial for Lonchar and the SEC.  The SEC

13  asserts that the trial as currently planned will last twenty days but that severance would increase

14  trial time to thirty days.  The SEC argues that severance would result in a large amount of

15  redundancy in pretrial and post trial motions, although it is not obvious to the Court that

16  severance would create any new issues for the parties to dispute.  At the same time, there is little

17  doubt that severance necessarily would result in at least some redundancy, such as empaneling

18  two separate juries and blocking off two separate periods of time for trial.

19  **F.    Prejudice to the defendants**

20       Defendants contend that they will be unduly prejudiced if severance is not granted.  They

21  are concerned about two separate forms of prejudice.  First, Leslie and Sallaberry fear that the

22  jury will be psychologically prejudiced against them because of the additional allegations

23  surrounding Lonchar.  However, as just discussed, the two sets of allegations are not related to

24  the same conduct.  Careful jury instructions should be effective to ensure that the jury can

25  separate out the two sets of allegations and the alleged conduct that is relevant to each.

26       Second, Defendants fear that the jury will be confused if evidence regarding both sets of

27  allegations is presented at the same time.  They contend that all of the transactions involved are

28  complex and governed by different, highly technical accounting rules.  Additionally, they

8

1  contend that evidence common to the two sets of allegations may be presented in a disjointed

2  fashion, leading to even more confusion.  Again, careful jury instructions should ensure that the

3  confusion is alleviated because, as pointed out by the Defendants themselves, the two sets of

4  claims involve conduct that is particular to each claim.  The Court also has considerable

5  discretion with respect to the order of proof at trial.

6  **G.    Witnesses and documentary evidence**

7  The SEC contends that it will present many common witnesses and a significant quantity

8  of common documentary evidence with respect to the two sets of allegations.  It claims that

9  eighteen witnesses have information relevant to both sets of allegations, including Leslie, and

10  that it will call both of its experts to opine on each set of allegations.  Leslie disputes the SEC's

11  representation as to the  number of common witnesses involved, arguing that only seven of fifty-

12  four witnesses appear to have knowledge relevant to both sets of claims.  The SEC also asserts

13  that it will present, as evidence with respect both sets of allegations, financial statements and

14  public disclosures from 2000 to 2003; the same management representation letters and Sarbanes-

15  Oxley certifications; and the same audit papers from both Ernst & Young and KPMG.

16  Defendants contend that different *parts* of the documents are relevant to the different sets of

17  allegations.

18  **G.    Timing of the motion**

19  Leslie moved for severance on December 18, 2009, shortly after the close of discovery.

20  At that time, a trial date of May 14, 2010 had been in place for approximately six months.  That

21  now has been vacated and the Court is engaged in a major criminal trial.  In light of this

22  development, severance would not cause significant delay.

23  **H.    Disposition**

24  While the conduct relevant to the AOL transaction is unrelated to the conduct relevant to

25  the 2004 restatement, the Court concludes that considerations of convenience and fairness do not

26  weigh in favor of severance.  Because of the significant number of common witnesses and

27  documents, severance would not result in judicial economy, and Defendants have not

28  demonstrated that they will be unfairly prejudiced unless a severance is granted.  Accordingly,

9

1   the motion will be denied.

2   ## III.  MOTIONS TO EXCLUDE EXPERT TESTIMONY

3       Defendants Lonchar and Sallaberry move to exclude the testimony of Dr. Lee J. Seidler

4   and Jeffery L. Davis, the SEC's expert witnesses.  Leslie joins in the motions.

5   **A.    Legal standard**

6       Before allowing an expert to testify, the Court has a responsibility to determine whether

7   the expert's opinion rests on a reliable foundation and is relevant to the issue before the Court.

8   *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow*

9   *Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  Fed. R. Evid. 702 provides that:

10          If scientific, technical, or other specialized knowledge will assist the trier of fact to
            understand the evidence or to determine a fact in issue, a witness qualified as an expert by
11          knowledge, skill, experience, training, or education, may testify thereto in the form of an
            opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the
12          testimony is the product of reliable principles and methods, and (3) the witness has
            applied the principles and methods reliably to the facts of the case.

13  A district court has broad latitude in deciding both how to measure reliability and the ultimate

14  reliability determination.  *Kumho*, 526 U.S. at 142.  The Court's focus at all times must be on the

15  principles and methodology at issue, not the expert's conclusions.  *See id.* at 152; *Daubert*, 509

16  U.S. at 595.

17  **B.    *Daubert* challenges to the SEC's accounting expert, Dr. Lee J. Seidler.**

18      The SEC offers Dr. Lee J. Seidler as an accounting expert who will provide opinions on

19  the concept of accounting materiality, generally accepted accounting principles ("GAAP"), and

20  the accounting treatment of both the AOL transaction and the conduct underlying the 2004

21  restatement.  Lonchar and Sallaberry move to exclude Seidler's testimony under *Daubert*.

22  Lonchar argues that Seidler's opinion is unreliable, that it will not be helpful to the jury, and that

23  Seidler lacks proper qualifications to testify in this matter.  Sallaberry makes similar arguments.

24  He also argues that the probative value of Seidler's opinion is substantially outweighed by its

25  unfairly prejudicial effect.

26      **1.      Seidler's methods are reliable**

27      Lonchar argues that Seidler's opinion is unreliable because he employed a "partisan

28

10

1    methodology" and his opinion is based on insufficient evidence.  Sallabery also asserts that

2    Seidler's methodology regarding materiality is unreliable because it is based on unexplained and

3    unsubstantiated subjective belief.

4                   **a.      Seidler's methodology is proper**

5           Seidler's expert report explains his principles and methods.  (Lonchar's Mot. to Exclude

6    Seidler, Ex. 3 ("Seidler report") at 8-13.)  Seidler describes the concept of materiality, referring

7    to the Financial Accounting Standards Board and Montgomery's Auditing, among other sources.

8    (*Id.* at 8-11.)  Seidler discusses GAAP, again referring to accounting authorities.  (*Id.* at 12-13.)

9    Seidler then describes the AOL transaction, referring frequently to accounting authorities

10   throughout the discussion.  Seidler also describes the transactions related to the 2004 restatement,

11   again referring to accounting authorities throughout the discussion.  Neither Lonchar nor

12   Sallaberry attacks directly any of the authorities cited, and the Court has no reason to believe that

13   the authorities are unreliable.  Nor do Defendants allege that Seidler misapplied the principles

14   cited.

15          Sallaberry argues that Seidler's materiality opinion impermissibly relies upon

16   "unexplained, unsubstantiated subjective beliefs."  To the contrary, Seidler discusses specifically

17   the concept of accounting materiality with support from accounting authorities, including widely

18   accepted definitions of quantitative and qualitative materiality.  (*Id.* at 8-11.)  He discusses the

19   quantitative effects of the accounting for both the AOL transaction, (*id.* at 14), and the 2004

20   restatement (*id.* at 23-24).  The rest of his report describes the circumstances of the accounting,

21   which he defines as relevant to qualitative materiality.  The report leaves no doubt that the

22   opinion on materiality flows from the application of the accounting authorities that Seidler

23   describes.

24          Sallaberry cites several cases in support of his argument.  *See IMA North America, Inc. v.*

25   *Marylyn Nutraceuticals, Inc.*, No. CV-06-344-PHX-LOA, 2008 U.S. Dist. LEXIS 109623, at *21

26   (D. Ariz. Oct. 17, 2008) (excluding an expert from providing testimony on the value of a

27   machine sale when the expert did not include value for the warranty, spare parts, and service that

28   were included undisputedly with the sale and where his stated methodology conflicted explicitly

                                                11

with the method he actually applied); *In re Software Tool Works Sec. Litig.*, 50 F.3d 615, 628 (9th Cir. 1995) (excluding an expert who opined on the defendants' knowledge without factual support); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425-26 (9th Cir. 1994) (excluding the same expert from *In re Software Tools* because he concluded that the defendants acted with scienter despite a factual record "that conclusive rebut[ted] any inference of scienter"). *In re Software Tools* has some relevance here, as the Court agrees that Seidler's opinion with respect to the subjective intentions of the parties is inappropriate. However, Seidler's opinion with respect to materiality is at least arguably supported by evidence in the record. The Court cannot say that Seidler's opinion is conclusively rebutted by the record or that Seidler failed to consider undisputed critical details.

Sallaberry's reliance on *SEC v. Mangan*, 598 F. Supp. 2d 731, 737 (W.D.N.C. 2008), also is misplaced. The district court in *Mangan* concluded that an opinion on materiality was insufficient in light of the fact that an unbiased market of reasonable investors had determined that the information in dispute was immaterial. The question at issue was whether a reasonable investor would have found the information important. Here, Seidler is opining on whether the information was sufficiently important from an accounting perspective. Moreover, in the Ninth Circuit, the reaction of the market is not dispositive of the issue of legal materiality. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003) (rejecting a bright-line rule due to inherent distortions in the real-world market). Rather, a change is stock price, or lack thereof, is merely one factor to examine.

### b.    The evidence upon which Seidler relied is proper

The bulk of Lonchar's objection to Seidler's testimony involves the factual basis of Seidler's opinion. Lonchar alleges that Seidler blindly accepted the SEC's version of the facts and ignored any and all evidence that contradicted that version. Lonchar also claims that Seidler did not review all of the evidence and instead relied upon the SEC's recommended consultant to gather factual information for him.

Seidler testified at his deposition that, when an issue was in dispute, he requested evidence to support the SEC's version of the facts. If there was evidence to support the SEC's

12

1  contention, Seidler accepted that contention for purposes of his report.  (Seidler Deposition,

2  Lonchar's Mot. to Exclude, Ex. 7 at 547:17-23.)  It is true that some facts in this case are in

3  dispute, but "[w]hen, as here, the parties' experts rely on conflicting sets of facts, it is not the role

4  of the trial court to evaluate the correctness of facts underlying one expert's testimony."

5  *MicroChemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).  Defendants may

6  cross-examine Seidler to attack the underlying factual premises of his report.

7          Indeed, Seidler admits that he did not review all of the documentary evidence.  However,

8  "[f]ailing to review all relevant evidence is not a ground for excluding [an expert's] testimony;

9  rather, it provides subject matter for cross-examination.  In short, Defendants' arguments go to

10 the weight of the expert's testimony rather than admissibility."  *SEC v. Johnson*, 525 F. Supp. 2d

11 70, 75-76 (D.D.C. 2007).  Defendants also assert that Seidler failed to review "crucial" witness

12 testimony that contradicts the factual premise of his report, but again Defendants may bring this

13 fact to the jury's attention on cross-examination.

14         Lonchar contends that Seidler relied improperly on evidence gathered by others.  When

15 Seidler was engaged by the SEC, the SEC recommended that Seidler use a consultant to help

16 gather information.  The SEC retained  RSM McGladrey for this purpose.  (SEC's Opp'n to

17 Lonchar's Mot. to Exclude, Ex. 3 at 24:18-22.)  Seidler testified that he did not receive input

18 from the SEC while he was writing his opinion.  (*Id*. at 106:24-107:4.)  In addition, when opining

19 with respect to some of the circumstances underlying the 2004 restatement, Seidler appears to

20 have relied largely on the data collected in the KPMG Restatement Issue Summary.  (Seidler

21 report at 23 n.66.)  An expert opinion may be based on data collected by others.  *Southland Sod*

22 *Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997).  If the Defendants dispute the

23 data that was collected, they may raise the issue on cross-examination

24         **2.      Portions of Seidler's opinion are not helpful to the jury**

25         Lonchar also argues that Seidler's opinions will not be helpful to the jury because

26 Seidler's report makes both credibility determinations and legal determinations.  The argument

27 essentially is an attack upon the quality of the evidence upon which Seidler relied.  "[T]his is yet

28 another criticism of [the expert] favoring [p]laintiff's view of the facts.  It is not grounds for

13

1   exclusion that he evaluated the credibility of evidence in reaching his conclusions." *Johnson*,

2   525 F. Supp. 2d at 76 n.6.

3   However, Seidler's opinion with respect to legal concepts and conclusions of law are

4   excludable. "[T]he use of expert testimony is not permitted if it will usurp either the role of the

5   trial judge in instructing the jury as to the applicable law or the role of the jury in applying that

6   law to the facts before it." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). Seidler

7   begins his discussion of materiality by explaining materiality from an accounting perspective.

8   (Seidler report at 8.) However, he later discusses legal materiality by providing actual citations

9   to several judicial opinions on the subject. (*Id.* at 8-9.) Seidler also quotes Securities Exchange

10  Rule 13b2-2 in its entirety. (*Id.* at 19.) This aspect of his opinion usurps the role of the trial

11  judge and is inappropriate. Seidler also makes references to "fraudulent" conduct and the

12  intentions of the parties. (*Id.* at 5, 14.) This determination is within the sole province of the jury.

13  Moreover, Seidler makes references to whether the auditors were misled or whether certain

14  statements were misleading. (*Id.* at 5 n.2.) The auditors may testify as to whether they were

15  misled, and it is for the jury to determine whether Defendants' statements in fact were

16  misleading. *See Johnson*, 525 F. Supp. 2d at 78 (excluding an expert who opined on the intent of

17  the defendant and whether the auditors were misled). The SEC argues that "fraudulent" may

18  have a different meaning in accounting literature than in legal circumstances. Even if that is true,

19  the risk of undue prejudice from Seidler's use of that legal term would substantially outweigh its

20  minimal probative value. *See* Fed. R. Evid. 403.

21  Seidler's report on occasion is argumentative and includes references to facts irrelevant to

22  his conclusions, such as a reference to Lonchar's educational credentials, (Seidler report at 7),

23  and speculation as to whether Sallaberry knew about the manner in which Lonchar allegedly was

24  recognizing professional service revenues in connection with the 2004 restatement, (*id.* at 24).

25  Accordingly, these aspects of Seidler's opinion also will be excluded.

26  **3.    Seidler is adequately qualified**

27  Lonchar and Sallaberry argue that Seidler should not be permitted to testify as an expert

28  because he is not qualified to opine on the transactions at issue. Defendants acknowledge

14

1   Seidler's impressive credentials, but they point out that he lacks experience relating to software

2   licensing transactions.  Lonchar relies upon *United States v. Chang*, 207 F.3d 1169, 1172-73 (9th

3   Cir. 2000), where a district court properly excluded a putative expert who was "extremely

4   qualified" in international finance from offering expert testimony relating to the authenticity of a

5   "Certificate of Payback Balance."  The putative expert "had expert knowledge regarding the

6   history of, and purpose for, the issuance of obligations like the Certificate," but had no formal

7   training in the identification of counterfeit securities.  *Id.  Chang* clearly is distinguishable:  the

8   instant case involves accounting related to business transactions, and Seidler has more than

9   ample formal training in applying accounting principles to business transactions.

10          Lonchar also calls the Court's attention to *Diaz v. Johnson Matthey, Inc.*, 893 F. Supp.

11   358, 372 (D.N.J. 1995), a case in which the court excluded the testimony of a pulmonologist who

12   had never treated a patient with a platinum allergy from testifying as an expert as to that specific

13   allergy.  The pulmonologist had read only a few papers on the allergy for purposes of the

14   litigation and had demonstrated his lack of familiarity with those papers in his testimony.

15   Lonchar points out that Seidler admittedly is not familiar with certain accounting rules that relate

16   to software licenses and non-monetary transactions – specifically SOP 97-2, APB 29, and TPA

17   5100.47 – or the term "concurrent transactions."

18          The standard of qualification as an expert witness under Rule 702 is not particularly high.

19   *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016, 1016 n.12 (9th Cir.

20   2004) (noting that qualification requires "minimal foundation" and that the court was unaware of

21   precedent that found it to be an abuse of discretion to admit an expert with general knowledge in

22   a field from testifying as to more specific issues).  It is undisputed that Seidler has experience

23   applying accounting rules to business transactions, and his report applies well-known accounting

24   principles to the transactions at issue.  Lonchar does not claim that any of these principles are

25   invalid or have been misapplied.  The fact that Seidler has not applied the particular rules desired

26   by Lonchar is not a basis for excluding Seidler's testimony.

27   //

28   //

15

Case No. C 07-3444
ORDER (1) DENYING MOTION TO SEVER ETC.
(JFEX1)

#### 4.    The probative value of Seidler's opinion is not substantially outweighed by the danger of unfair prejudice

Sallaberry argues that, notwithstanding the foregoing discussion, Seidler's entire opinion should be excluded under Fed. Rule Evid. 403 because the probative value of the opinion is substantially outweighed by the danger of unfair prejudice.  However, the Court is not persuaded that Seidler's opinion is "highly subjective and unsubstantiated."  As discussed above, Seidler's conclusions flow from the accounting principles described.  Sallaberry also argues that the jury will confuse Seidler's discussion of accounting materiality with legal materiality, and indeed Seidler's discussion of legal materiality for the most part is subject to exclusion.  That said, the balance of Seidler's discussion of accounting materiality is proper.  Careful jury instructions should ensure that the jury will be able to distinguish between the two concepts of materiality.

#### 5.    Disposition

Accordingly, Seidler may testify at trial.  However, he may testify regarding only the appropriate portions of his expert report.  He may not testify as to legal concepts, the legal interpretation of case law and statutes, or whether specific conduct was fraudulent, intentional, or misleading in the legal sense.

### C.    Motions to exclude the expert testimony of Jeffrey L. Davis

The SEC offers Jeffrey L. Davis as a rebuttal expert to Defendants' expert Thomas Peter Berquist, who offered an opinion with respect to the importance of the 2003 restatement to reasonable investors.  Sallaberry moves to exclude Davis as an expert witness under *Daubert*.  Lonchar moves under Fed. R. Civ. P. 26(a) to exclude portions of Davis's testimony that refer to the 2004 restatement.  Because Davis was not disclosed on the date designated for initial expert disclosures, Davis may offer testimony only to rebut the testimony of other experts.  Lonchar argues that no defense expert offered an opinion that these aspects of Davis's opinion would "rebut."

#### 1.    Davis's report

Davis opines as to whether both the 2003 and 2004 restatements were important to investors.  (Lonchar's Mot. to Exclude Davis, Ex. A ("Davis report") at ¶ 6.)  In forming his

16

opinions, Davis performed an "event study," which is "a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price.  For securities-fraud purposes, the 'event' analyzed is the disclosure of the alleged fraud to the market."  *In re Apollo Group, Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 844-45 (D. Az. 2007).  Davis examined Veritas's stock price in relation to six different events:

- November 15, 2002:  the date on which the market first had the opportunity to react to Veritas's Form10-Q that disclosed, among other things, that the SEC had subpoenaed records relating to the AOL transaction[11]

- January 17, 2003:  the date on which Veritas announced that it would restate its financials related to the AOL transaction

- March 17, 2003: the date on which Veritas issued the 2003 restatement that restated the financials of the AOL transaction

- March 18, 2003: the day after the 2003 restatement was issued

- March 15, 2004: the date on which Veritas announced it would restate its financials related to the "smoothing violations"

- March 16, 2004: the day after Veritas announced the 2004 restatement

(Davis report at ¶ 11-14.)  Davis used a statistical model of the daily price of Veritas stock for three separate time periods to filter out factors unrelated to the disclosures just described.  (*Id.* at ¶ 16.)  Davis performed twenty-seven regression analyses: nine for each time period.  (*Id.* at ¶ 18.)  He assumed that a company's stock price incorporates all publicly available information quickly and that information is material if it causes a statistically significant change in the stock price.  (*Id.* at ¶¶ 21-22.)

Davis concluded that the disclosure on November 14, 2002 was material, (*id.* at ¶ 21), but that neither the disclosure on January 17, 2003 nor the disclosure on March 17, 2003 was important to investors.  (*Id.*)  He reasoned that the market understood that Veritas would need to restate its financials based on the November 14, 2002 disclosure, and that accordingly the effects

---

[11]  Veritas released the Form 10-Q on November 14, 2002, after the market had closed. (Davis Report at ¶ 11.)

1  of the 2003 restatement already had been priced into the stock.  Davis also concluded that the

2  disclosure on March 15, 2004 was material, despite the fact that there was no significant change

3  in the price of Veritas stock that day.  (*Id.* at 22.)  He noted that there was a significant change in

4  the price the next day, and opined that the disclosure was not priced into the stock until that day

5  because the March 15, 2004 trading day was only a half day.

6      **2.    Sallaberry's *Daubert* challenge**

7      Sallaberry claims that Davis's opinion is unreliable for two reasons.  First, he argues that

8  Davis's conclusion surrounding the November 14, 2002 disclosure is illogical because that

9  disclosure did not reveal the alleged misrepresentations of the named defendants.  Second, he

10  contends that Davis's conclusion is unreliable because it did not filter out other negative

11  information contained in the disclosure.

12      **a.    The information revealed by the November 14, 2002 disclosure**

13      Sallaberry relies heavily on *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d

14  1049 (9th Cir. 2008).  In that case, the defendants operated a large, national system of for-profit

15  vocational colleges.  The plaintiffs alleged widespread fraud in enrollment practices designed to

16  maximize Title IV funding in the form of financial aid to students.  The plaintiffs asserted loss

17  causation based either of two events: (1) a news story about a government investigation and

18  sanction resulting from admissions fraud at one campus in California or (2) an earnings

19  announcement that disclosed both "higher than anticipated attrition" and "voluntary compliance"

20  with the California Attorney General's requests for information regarding admissions practices.

21  The court found that neither event could support an inference of the disclosure of widespread

22  admissions fraud.

23      The news article about the government investigation and sanction noted specifically that

24  the investigation "[did] not affect the status of other Corinthian schools."  *Id.* at 1064.  The

25  defendants operated a system of eighty-eight schools.  *Id.*  The court reasoned that the disclosure

26  could not have alerted investors that there was widespread admissions fraud in the defendants'

27  operations, and that at most, the disclosure of admissions fraud at one campus revealed only the

28  risk of admissions fraud at other campuses.  *Id.* at 1064-65.

18

1    The earnings announcement disclosed several facts, including that the defendants had

2    missed their revenue forecast, that they had revised their earnings forecast downward for the next

3    year, that attrition rates were higher than expected, and that enrollment had increased forty-nine

4    percent overall. *Id.* at 1065.  The plaintiffs argued that the disclosure regarding attrition was a

5    euphemism for enrollment fraud.  The court again disagreed, concluding that the plaintiffs'

6    inference was implausible given that enrollment had increased to such a large extent.  The court

7    reasoned that it was far more plausible that the stock price fell because the defendants had missed

8    their earnings forecast. *Id.* at 1065.  The court observed that no case supported "the notion that

9    loss causation is pled where a defendant's disclosure reveals a 'risk' or 'potential' for widespread

10   fraudulent conduct." *Id.* at 1064.

11   Sallaberry argues that *Metzler* is controlling, with the obvious concession that the SEC

12   need not show loss causation.  He contends that because the Form 10-Q dated November 14,

13   2002 did not reveal the "truth" of an alleged misrepresentation or fraud, Davis could not

14   conclude reliably that the market priced in any restatement relating to the AOL transaction or

15   form a reliable opinion as to the materiality of the 2003 restatement based on a stock price

16   movement on November 14, 2002.

17   The Form 10-Q dated November 14, 2002 states that:

18   In response to subpoenas issued by the Securities and Exchange Commission in the
     investigation entitled *In the Matter of AOL/Time Warner*, we are furnishing information
19   to the SEC, including information relating to the transactions we entered into with AOL
     in September of 2000.  We are cooperating with the SEC's investigation.
20
     The transaction involved a $50 million software license and services sale to AOL and a
21   $20 million advertising services purchase from AOL.  We recognized $37 million of
     revenue in the fourth quarter of 2000 and have been recognizing the remaining $13
22   million as revenue over the three-year support period.  The $20 million of advertising
     expense was recorded over the five quarters during which AOL provided advertising
23   services to us, beginning in the fourth quarter of 2000 and ending in the fourth quarter of
     2001.  We are currently reviewing our accounting treatment for these transactions,
24   focusing on the $20 million of advertising services expenses and $20 million of the
     revenue.
25
26   (Mauch Decl. in support of Sallaberry's Mot. to Exclude ("Mauch Decl."), Ex. 3 at 70.)  The

     SEC argues that the Form 10-Q does assert the "truth" of the alleged misrepresentations.  Davis
27
     reviewed a news article dated November 14, 2002 that discussed the fact that AOL already was
28

19

1  involved in criminal and civil investigations regarding advertising deals such as the one disclosed

2  by Veritas.  (Davis report, Ex. 2, Document 13; Williams Decl. ISO SEC's Opp'n to Lonchar's

3  Mot. to Exclude Davis, Ex. 7 (providing a copy of the article).)  The Form 10-Q also was rather

4  specific, focusing on the $20 million figure.  The SEC contends that this information permits the

5  logical inference that Veritas overstated $20 million in revenue from the AOL transaction.

6      The Court is persuaded that the instant case is distinguishable from *Meltzer*.  The market

7  had knowledge that AOL was under investigation for its accounting with respect to advertising

8  deals of this nature.  The market also knew that AOL had restated its financials in connection

9  with similar deals.  (*See* Williams Decl. ISO SEC's Opp'n to Lonchar's Mot. to Exclude Davis,

10  Ex. 7.)  The November 14, 2002 disclosure permits the reasonable inference that Veritas – a

11  counter-party to one of those AOL advertising deals – also would restate its financials.  By

12  focusing on the $20 million figure, the November 14, 2002 disclosure provided sufficient

13  information for the market to understand the amount of a future restatement.  Defendants may

14  cross-examine Davis vigorously to persuade the jury that his opinion is incorrect, but the opinion

15  meets the minimum threshold for reliability.

16      **b.      Filtering for other information contained in the November 15, 2002
             disclosure**

17      Sallaberry also objects that Davis did not filter out the effect of other negative

18  information contained in the Form 10-Q.  If other information in the Form 10-Q could be

19  responsible for the statistically significant change in stock price on November 15, 2002, then

20  Davis's conclusion that the AOL accounting disclosure was material might not be reliable.

21  While Davis testified that he did not read the entire Form 10-Q, he contends that he nonetheless

22  accounted sufficiently for any confounding variables by looking at news articles from November

23  15, 2002.  (Davis Deposition, SEC's Opp'n to Lonchar's Mot. to Exclude Davis, Ex. 4 at 161:9-

24  15.)  He claims that the news articles focused mainly on the AOL transaction and that nothing in

25  the news articles suggested that anything else of importance happened with respect to Veritas on

26  that day.  (*Id.*)

27      Sallaberry argues that a more appropriate filtering mechanism would have been to read

28

20

1    analyst reports rather than news reports.  Sallaberry attaches several news articles to his moving

2    papers.  (*See* Garrett Decl. in Support of Sallberry's Reply to Mot. to Exclude ("Garrett Decl."),

3    Exhs. 1-9; Mauch Decl., Exhs. 8-13.)  He contends that the news articles cannot serve as a

4    reliable filter because they do not reveal the certainty of a financial restatement, they discuss

5    issues other than the AOL transaction, there is "important information" in the Form 10-Q that is

6    not referenced in any article, and the interests of the authors are not aligned necessarily with the

7    interests of reasonable investors.  While each of these arguments appropriately may be raised on

8    cross-examination, they do not show that Davis's opinion should be excluded entirely.  Although

9    the articles do not suggest the certainty of a restatement, many of them discuss the SEC's

10   investigation in a negative light, referencing the fact that AOL restated similar transactions.

11   (*See* Garrett Decl. Exhs. 1, 2, and 5.)   While the articles do discuss other issues, they do not do

12   so in a manner that appears to be negative.  Sallaberry's assertion that there was "important

13   information" that was not referenced in any article is peculiar: if the information was important

14   to the market, it necessarily would have been the subject of discussion.  Finally, the Court is

15   satisfied that news reporters discuss information disclosed in quarterly reports because they

16   believe that the information might be of interest to reasonable investors.

17       Sallaberry cites several district court decisions in support of his argument.  *See In re*

18   *Xcelera.com Sec. Litig.*, NO. 00-11649-RWZ, 2008 WL 7084626, at *2 (D. Mass. Apr. 25, 2008)

19   (excluding an expert who did not consider the impact of other disclosures despite news reports

20   with significant negative discussion of these other disclosures), *In re Omnicom Group, Inc. Sec.*

21   *Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (granting summary judgment because the

22   plaintiffs could not prove loss causation with an expert's opinion that used an event study which,

23   among other things, failed to account for important confounding factors identified in or created

24   by news reports), *In re Executive Telecard Sec. Litig.*, 979 F. Supp. 1021, 1026 (S.D.N.Y. 1997)

25   (excluding an expert witness that did not consider the effect of a company's proposed spin-off

26   even though "there were significant shareholder concerns 'about the wisdom of the proposed

27   spinoff'"), and *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993) (faulting an

28   expert who, among other things, did not use an event study to "more accurately [] isolate the

21

1   influence of information specific to Oracle which defendants allegedly have distorted").

2   However, most of those cases focus on the fact that the experts failed to consider information

3   that other sources clearly had identified as relevant.

4        Sallaberry refers the Court to an analyst report by US Bankcorp, which references several

5   other negative factors, including increasing competition, lower demand for the type of products

6   that Veritas sells, a current sales force poll, lack of growth, and margin compression. (Mauch

7   Decl. Ex. 14.)  The report also refers to the AOL transaction as "water under the bridge." (*Id.*)

8   The authors believed that "the current risk is that there were other unnatural acts" in connection

9   with the AOL transaction.  (*Id.*)  The Court notes that the report is dated November 26, 2002, and

10  accordingly is not necessarily strong evidence of what investors thought was important on

11  November 15, 2002.  Moreover, while the US Bankcorp report is negative, the additional

12  information contained in that report is not as critical as that at issue in the cases relied upon by

13  Sallaberry.  While Sallaberry certainly may argue to the jury that Davis did not reliably filter out

14  other confounding variables that would have affected the stock price on November 15, 2002, he

15  has not shown that Davis' opinion is so unreliable that it must be excluded.

16   **2.   Lonchar's Rule 26 Challenge**

17       Lonchar contends that Davis's opinion with respect to the 2004 restatement must be

18  excluded because it does not rebut testimony of Defendants' experts.  The SEC claims that the

19  opinion in dispute is rebuttal to the Berquist report offered by Defendants.  Berquist summarized

20  his opinion as addressing the question, "[w]ould a reasonable investor have considered the

21  restatement of VERITAS' financial statements in March 2003 . . . to be important to a decision to

22  buy or sell the stock of VERITAS?"  (Lonchar's Mot. to Exclude Davis, Ex. B ("Berquist

23  report") at 7.)  Lonchar argues that Davis's references to the materiality of the 2004 restatement

24  thus are inappropriate.

25       In response, the SEC asserts that Davis's opinion with respect to the impact of the 2004

26  restatement rebuts the central premise of the Berquist report.  Berquist opines that the 2003

27  restatement was not material because it did not meaningfully impact Veritas's earnings per share

28  ("EPS") estimate.  (Berquist report at 13.)  Instead of focusing on EPS estimates, Davis's

analysis focuses on statistically significant changes in share price. (Davis report at ¶ 10.) The SEC argues that demonstrating the impact of the 2004 restatement on Veritas's share price rebuts Berquist's central premise that effects on EPS estimates are the only significant measure of materiality. The Court concludes that this argument is seriously flawed. Berquist explicitly did not analyze the effect of 2004 restatement on Veritas's EPS estimates. Davis thus cannot know whether analyzing the effect of the 2004 restatement under his method would reach a different conclusion than analyzing those effects under Berquist's method.

The SEC also argues that although Berquist never opined on the subject of the 2004 restatement, Lonchar has offered an accounting expert who does offer an opinion on that subject. That expert, J. Duross O'Bryan, does discuss the materiality of the accounting underlying the 2004 restatement. However, O'Bryan, like Seidler, is an *accounting* expert. Unlike Davis, O'Bryan did not discuss materiality from the perspective of a "reasonable investor." Though O'Bryan does not define specifically his working concept of materiality, he appears to refer to accounting materiality only, and his report focuses extensively on the application of GAAP. (*See* Lonchar's Reply in Support of Mot. to Exclude Davis, Ex. B at ¶ 17.)

**3.    Disposition**

Davis may testify at trial because he has met the minimum threshold for reliability. However, he may testify with only with respect to the 2003 restatement; his testimony with respect to the 2004 restatement will be excluded pursuant to Rule 26.

**IV.  MOTIONS FOR SUMMARY JUDGMENT**

All Defendants move for summary judgment regarding the SEC's claims related to the AOL transaction. Defendants argue that there is insufficient evidence in the record to support an inference of the mental states required by the various claims or that any of their alleged misstatements were material. Separately, Sallaberry argues that the evidence cannot support a finding that he was involved in making misstatements and preparing Veritas's records.

**A.    Legal standard**

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

1   56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The standard applied to a

2   motion seeking partial summary judgment is identical to the standard applied to a motion seeking

3   summary judgment of the entire case. *See Urantia Foundation v. Maaherra*, 895 F.Supp. 1335,

4   1335 (D. Ariz. 1995). The moving party bears the initial burden of informing the Court of the

5   basis for the motion and identifying the portions of the pleadings, depositions, answers to

6   interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of

7   material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

8        If the moving party meets this initial burden, the burden shifts to the non-moving party to

9   present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e);

10   *Celotex*, 477 U.S. at 324. A genuine issue for trial exists if the non-moving party presents

11   evidence from which a reasonable jury, viewing the evidence in the light most favorable to that

12   party, could resolve the material issue in his or her favor. *Anderson*, 477 U.S. 242, 248-49;

13   *Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991). It is not this Court's task to "scour

14   the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th

15   Cir. 1996) (internal citations and quotations omitted). The non-moving party has the

16   responsibility to identify with reasonable particularity the evidence which precludes summary

17   judgment. *See id.*

18   **B.    Requisite mental states**

19        The SEC's claims require a showing of various mental states. To establish a claim under

20   Section 17(a)(1) and Rule 10b-5, the SEC must prove that the Defendants acted with scienter.

21   *S.E.C. v. Leslie*, No. C 07-3444, 2008 WL 3876169, at *5 (N.D. Cal. Aug. 19, 2008). However,

22   scienter is not required to establish liability under Sections 13b2-1 and 13b2-2.[12, 13]   *S.E.C. v.*

23

24        [12]  17 C.F.R. 240.13b2-1 provides that "No person shall directly or indirectly, falsify or

25   cause to by falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities
     Exchange Act."

26        [13]  17C.F.R. 240.13b2-2(a) provides that: "No director or officer of an issuer shall, directly

27   or indirectly:

28        (1) Make or cause to be made a materially false or misleading statement to an accountant
          in connection with; or

24

1   *Leslie,* No. C 07-3444 JF, 2008 WL 4183939, at *1 (N.D. Cal. Sept. 9, 2008).  To establish a

2   claim under Section 17(a)(2) and (a)(3), the SEC must prove that Defendants acted negligently.

3   *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007).  To establish a claim for any aiding and abetting

4   violation, the SEC must establish that Defendants actually knew of the primary violation and

5   their own role in furthering it.  *Leslie*, 2008 WL 3876169 at *7.  Finally, to establish a claim

6   under Section 13(b)(5) for failing to implement a system of internal accounting controls, the

7   plain language of the statute requires that a defendant act "knowingly."  15 U.S.C.A. §

8   78m(b)(5).

9           **1.      Acting with scienter when providing a misstatement**

10          The SEC alleges that Defendants provided misstatements to Veritas's outside auditor,

11   Ernst & Young, resulting in the improper accounting treatment of the AOL transaction.

12   Additionally, the SEC alleges that Lonchar is responsible for misstatements in Veritas's public

13   filings.  "A projection or statement of belief is a 'factual' misstatement actionable under § 10(b)

14   if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3)

15   the speaker is aware of undisclosed facts tending seriously to undermine the statement's

16   accuracy."  *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994).

17          At least with respect to the Section 17(a)(1) and Rule 10b-5 claims, the SEC must show

18   that the Defendants acted with scienter when providing a material misstatement.[14]  *Gebhart v.*

19   *SEC*, 595 F.3d 1034, 1040 (9th Cir. 2010) (citing *Ponce v. SEC*, 345 F.3d 722, 729 (9th Cir.

20

21          (2) Omit to state, or cause another person to omit to state, any material fact necessary in
22          order to make statements made, in light of the circumstances under which such statements
            were made, not misleading, to an accountant in connection with:
23
24                  (i) Any audit, review or examination of the financial statements of the issuer
                    required to be made pursuant to this subpart; or
25
26                  (ii) The preparation or filing of any document or report required to be filed with
                    the Commission pursuant to this subpart or otherwise.
27

28          [14]  This subsection discusses whether misstatements were made with scienter.  The
     materiality of any misstatements is discussed below at subsection IV.B.

                                                    25

1    2003)).  Scienter is defined as a "mental state embracing intent to deceive, manipulate or

2    defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  Scienter also may be

3    established by a showing of reckless conduct that consists of "a highly unreasonable act, or

4    omission, that is an 'extreme departure from the standards of ordinary care, and which presents a

5    danger of misleading buyers or sellers that is either known to the defendant or is so obvious that

6    the actor must have been aware of it.'" *S.E.C. v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir.

7    2001) (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (*en*

8    *banc*)).  "Scienter may be established, therefore, by showing that the defendants knew their

9    statements were false, or by showing that defendants were reckless as to the truth or falsity of

10   their statements." *Gebhart,* 595 F.3d at 1041 (citing *Ponce*, 345 F.3d at 729-30).  "Summary

11   judgment is generally inappropriate when mental state is an issue, unless no reasonable inference

12   supports the adverse party's claim." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 739 F.2d

13   1434, 1436 (9th Cir. 1984).

14              a.       **The 2003 restatement is not sufficient evidence of scienter in and of**

15                       **itself**

16           Standing alone, the 2003 restatement is not sufficient evidence that Defendants made

17   misstatements or acted with scienter.  "'[T]he mere publication of inaccurate accounting figures,

18   or a failure to follow GAAP, without more, does not establish scienter.'" *In re Software*

19   *Toolworks, Inc. v. Painewebber, Inc.*, 50 F.3d 615, 627 (9th Cir. 1995) (quoting *In re Worlds of*

20   *Wonder Sec. Litig*, 35 F.3d 1407, 1412 (9th Cir. 1994), *superseded by statute on other grounds*,

21   Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2), *as recognized in Copperstone*

22   *v. TCSI Corp.*, No. C 97-3495 SBA, 1999 WL 33295869, at *14 n.13 (N.D. Cal. Jan. 14, 1999)).

23              b.       **Omission of the negotiation history**

24           The SEC points out that Defendants did not inform Ernst & Young of the negotiation

25   history of the AOL transaction, specifically the "eleventh hour" price change.  However, the SEC

26   has not presented any evidence that the Ernst & Young auditors asked Defendants for such

27   information.  The SEC contends that the auditors did ask questions "regarding the background,

28   the business purpose for the arrangement."  (Calvello Deposition, SEC's Opp'n to MSJ, Ex. 38 at

                                                      26

63:20-25.)  However, two of the auditors testified that they did not ask Defendants about the

negotiating history and that they would not have expected Defendants to have informed them

about that history.  (*See* Calvello Deposition, Leslie's MSJ, Ex. PP at 134:19-135:23 (Calvello

testifying that he did not ask about the negotiation history, that he did not expect Veritas to

inform him of that history, and that he did not think that it was important at that time);

Cherrstrom Deposition, Leslie's MSJ, Ex. CCC at 276:11-25 (Cherrstrom testifying that he did

not ask Leslie about the negotiating history).)  The auditors spoke to several Veritas employees

who knew about the eleventh-hour price change, and the negotiating history was not discussed in

any of those meetings.  The SEC has not cited any record that could support the inference that

Defendants knew that the negotiating history was relevant to the revenue recognition of the AOL

transaction.  Without that evidence, the SEC cannot show that the Defendants misled the auditors

solely by not informing them of the negotiating history.

### c.   Mark Leslie

The SEC alleges that Leslie, in his contacts with Veritas's external auditors,

misrepresented that (1) there were valid business reasons for the advertising purchase and that

Veritas needed the advertising, (2) the license and the advertising purchase were separate

agreements that were not contingent upon each other, and (3) the license and the advertising

purchase each were fairly priced.

### i.   Leslie's knowledge of the AOL transaction

The SEC has presented evidence that Veritas management had approved a software

licensing agreement with AOL for $30 million.  (Kelly Investigative Testimony, SEC's Opp'n to

MSJ, Ex. 42 at 37:2-4.)  This would have been the largest transaction in Veritas's history up to

that point.  (Saunders Deposition, SEC's Opp'n to MSJ, Ex. 8 at 292:22-292:3.)  AOL's Terry

Laber signed the agreement at the $30 million price on September 29, 2000.  (Laber Investigative

Testimony, SEC's Opp'n to MSJ, Ex. 108 at 139:18-21.)  Before Veritas signed the agreement,

Laber called Leslie.  (Kelly Investigative Testimony, SEC's Opp'n Ex. 42 at 117:7-17.)  Leslie

described Laber as asking Leslie if he could "do me a favor."  (*Id.* at 117:17-19.)  Laber asked

Leslie to restructure the deal to increase the price of the software license and to add an

27

advertising component. (*Id.* at 117:22-24.) Leslie, describing the deal to Veritas's board of directors, said that "at the eleventh hour we got a request from AOL to gross up the deal by $20 million and take back an equal amount of dollars in paid advertising to AOL." (SEC's Opp'n to MSJ, Ex. 30.)

### ii.   Valid business reasons and the need for advertising

In January 2002, Leslie spoke with Ernst & Young about the AOL transaction. Jeffrey Calvello, one of the Ernst & Young auditors, has testified as follows:

> Q:   During that discussion, did Mr. Leslie represent that the two agreements were entered into for separate and valid business reasons?
>
> A:   Yes.

(Calvello Investigative Testimony, SEC's Opp'n to MSJ, Ex. 56 at 70:17-20.) Leslie also told Kenneth Cherrstrom, another Ernst & Young auditor, that Veritas needed to enter into the advertising deal for its brand recognition campaign. (Cherrstrom Investigative Testimony, SEC's Opp'n Ex. 47 at 63:15-18.)

The SEC alleges that Veritas did not want or need AOL advertising. On September 21, 2000, eight days before the agreement was signed, Laber was copied on an email from another AOL employee discussing the status of an advertising deal with Veritas. (SEC's Opp'n to MSJ, Ex. 11.) The email states: "status of ad deal – he said they weren't close, and that Veritas was talking about doing ads after Jan. 1" and that "there were no hard figures on the table, but suggested $1M or so." (*Id.*[15]) On September 1, 2000, Gary Florence, a Veritas sales representative who was involved in the AOL transaction, told AOL's John Najarian that Leslie "strongly questioned whether the market segments reached via AOL/Netscape were in line with our objectives." (SEC's Opp'n to MSJ, Ex. 9.) Mark Griffiths, Veritas's director of corporate marketing, referred to the deal in an internal email as "a consequence of the sales transaction that

---

[15]   Leslie objects to this and most of the other evidence discussed in this paragraph as hearsay. The SEC contends that it can produce witnesses at trial who can testify from personal knowledge as to the contents of this email. This representation is sufficient for purposes of a motion for summary judgment. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (finding that "[i]t would be sufficient if the contents of the [evidence] are admissible at trial, even if the [evidence] itself may be inadmissible").

occurred. I think that all marketing people agree that this is not something we would have done." (SEC's Opp'n to MSJ, Ex. 116 at VAOL0100974.[16]) Cynthia Martin, Veritas's director of marketing and communications, answered in the affirmative when asked if she believed it was a "stupid deal." (Martin Investigative Testimony, SEC's Opp'n to MSJ, Ex. 98 at 87:5-6.) She disapproved of the deal because "it was a lot of money spent off our strategy, our advertising strategy." (*Id.* at 87:8-9.[17]) Leslie had knowledge of that strategy because he participated in Veritas's branding council. (Leslie's MSJ at 4:13-19.)

Leslie presents evidence that he believed that Veritas did have a strong business interest in the advertising component of the deal. Griffiths testified at his deposition that he had a conversation with Leslie "about trying to find a partnership with a large online organization that we could develop that would allow us to have a better presence in the online space." (Griffiths Deposition, Leslie's MSJ, Ex. S at 46:3-7.) Leslie was CEO, a member of the branding council, and had discussions with Griffith – the director of corporate marketing – specifically about advertising with AOL. (*Id.*) Nonetheless, viewed in the light most favorable to the SEC, this evidence creates only a genuine issue of material fact with respect to Leslie's state of mind. Although Leslie and Griffiths discussed advertising with AOL, Griffith stated specifically that he disapproved of this specific advertising purchase. Based on the evidence, a reasonable jury could find that Leslie did not believe that Veritas desired advertising of this magnitude from AOL.

### iii.    Separate or contingent agreements

The SEC contends that Leslie also misrepresented the contingent nature of the license and advertising purchase. Calvello has testified as follows:

> Q:    And the next sentence, "Furthermore, Veritas management have represented that AOL's commitment to pay the software license and service fees was from that separate arrangement's initiation, never contingent on the company entering into

---

[16] Leslie objects to this evidence as speculation. However, Griffiths may testify as to what he, as the director of corporate marketing, would or would not have done.

[17] Leslie objects to Martin's testimony, arguing that she is speculating as to the advertising strategy because she did not participate in the branding council. In the light most favorable to the SEC, Veritas's director of marketing and communications would have personal knowledge of the company's advertising strategy.

Case No. C 07-3444
ORDER (1) DENYING MOTION TO SEVER ETC.
(JFEX1)

1    the advertising purchase agreement", do you see that sentence?

2    A:    Yes, I do.

3    Q:    Okay.  Did Mr. Leslie make that representation to you during your meeting with
          he and Mr. Lonchar?

4    A:    Yes.

(Calvello Investigative Testimony, SEC's Opp'n to MSJ, Ex. 56 at 71:5-14.)  Leslie denies

making such a statement, but this creates only a dispute of material fact as to whether this

conversation occurred as recounted by Calvello.  Leslie claims that he does not understand what

"contingent" means to an accountant.  It is true that the ordinary meaning of the word varies

depending on the context.  For example, "contingent" can mean "happening or coming by

chance; not fixed by necessity or fate; accidental, fortuitous", (Oxford English Dictionary (2d ed.

1989)), or it can mean "that does not exist of itself, but in dependence on something else," (*id.*).

However, given the context of Calvello's question, there is a reasonable inference that Calvello

was referring to the latter definition.

     Viewed n the light most favorable to the SEC, the evidence supports the inference that

Leslie understood that the license was dependent upon the advertising purchase.  Leslie has

testified that:

     A:    I believe that at the juncture where our proposal had been made at $30 million,
          had nothing else changed, we would not have been able to generate a shallower
          discount.  But something else changed.
          . . .

     Q:    So what had changed?

     A:    They wanted us to do advertising.  And the deal moved to a different level of
          authority in the company.  And those two things said together, "Gee, you can do a
          bigger deal here."

(Leslie Investigative Testimony, SEC's Opp'n to MSJ, Ex. 39 at 95:13-24.)  The reference to a

"shallower discount" refers to the price of Veritas's software license.  A deeper discount would

allow AOL to pay a lower price.  Conversely, a shallower discount would require AOL to pay a

higher price.  This statement, together with Laber's request for a "favor," reasonably supports an

inference that Leslie understood that the $50 million price of the licensing agreement depended

upon the purchase of advertising.

30

1          **iv.      Fair value of the agreements**

2          Leslie signed both a representation letter to Ernst & Young and the Form 10-K filed for

3   2000.  (*See* SEC Opp'n to MSJ, Exhs. 83 and 106.)  The representation letter stated that both the

4   license and the advertising purchase, valued at $50 million and $20 million, respectively, were

5   recorded at "fair value within reasonable limits."  (*Id.*, Ex. 106 at 2.)  The Form 10-K publicly

6   disclosed the license as a $50 million deal and the advertising agreement as a $20 million deal.

7   (*Id.*, Ex. 106.)  The SEC does not offer any evidence that could support an inference that Leslie

8   understood what "fair value" would mean to an accountant.  Because Veritas originally proposed

9   the license to AOL at a price of $64 million, the $50 million price does not appear to be

10  objectively unreasonable or unfair.   Nonetheless, Leslie described the deal as an "eleventh hour .

11  . . gross up" by $20 million, (SEC's Opp'n to MSJ, Ex. 30), and he directed Sallaberry to pay

12  sales commissions on $30 million rather than $50 million, (Sallaberry Deposition, SEC's Opp'n

13  to MSJ, Ex. 19 at 228:5-229:12).  Viewed in the light most favorable to the SEC, the latter

14  evidence could support an inference that Leslie did not believe that the license was valued fairly

15  at $50 million, even under a layperson's understanding of the concept.

16         **iv.      Evidence of scienter**

17         As discussed previously, scienter may be established by showing that Leslie knew his

18  statement was false or by showing he was reckless as to the truth or falsity of his statement.

19  *Gebhart,* 595 F.3d at 1041.  The evidence permits the inference that Leslie knew that the

20  accounting regarding the AOL transaction was sensitive.  On October 3, 2000, Steven Brooks, a

21  member of Veritas's board of directors and audit committee chairman, sent an email to Leslie,

22  asking, "[O]n the AOL deal, can we make doubly sure that EY [Ernst & Young] are on board

23  with our revenue recognition in the barter context?  A fair amount of SEC controversy surrounds

24  the topic." (SEC Opp'n to MSJ, Ex. 31.)  Brooks again emailed Leslie on October 5, 2000,

25  discussing "the recent large transaction" and the "two separate transactions notion." (SEC's

26  Opp'n to MSJ, Ex. 32.)  Brooks stated that "[i]t will not hurt to be extra cautious, since as you

27  know better than I, a single revenue recognition taint can utterly destroy a stock." (*Id.*)  Kenneth

28  Cherrstrom subsequently informed Leslie that the accounting for the transaction would depend

31

on Ernst & Young's analysis.  (Cherrstrom Deposition, SEC Opp'n Ex. 57 at 299:12-15.)

Regardless of whether he understood the term "barter context," Brooks' emails were sufficient to

alert Leslie that revenue recognition for the AOL deal was controversial.  Cherrstrom's testimony

also permits the inference that Leslie knew that the information he provided to Ernst & Young

would affect the revenue recognition for the AOL transaction.  Viewed in the light most

favorable to the SEC, the evidence reasonably supports an inference that Leslie knew that he had

made a misrepresentation to Ernst & Young, that the revenue recognition of the AOL transaction

was controversial, and that his statements could affect the revenue recognition of the largest

transaction in Veritas's history.

Leslie's arguments to the contrary are insufficient to disrupt this chain of permissible

inferences.  Leslie points to evidence tending to show that the license was valued fairly at $50

million (or at least that he believed it to be) and that he understood that the deals were not

contingent.  This serves only to create a dispute of material fact.  Leslie contends that he openly

described the details of the AOL transaction to Veritas's board of directors and audit committee,

whose members also were likely to discuss the transaction with Ernst & Young.  Even this,

however, would not excuse Leslie personally from making misrepresentations to Ernst & Young.

Leslie relies on *SEC v. Todd*, No. 03CV2230, 2007 WL 1574756, at *5 (S.D. Cal. May

30, 2007), in which the SEC alleged that a CEO had hidden the relatedness of two transactions.

The court in that case found that the SEC could not show scienter because the CEO had disclosed

all of the details of the transaction to the company's board of directors.  However, the CEO in

*Todd* did not have direct contact with the outside auditors who were reviewing the transaction.

He also relies on *SEC v. Goldfield Deep Mines, Co.*, 758 F.2d 459, 467 (9th Cir. 1985) and *SEC*

*v. Coffman*, No. 06CV00088, 2007 WL 2412808, at *14 (D. Co. Aug. 21, 2007) for the

proposition that the SEC cannot show scienter because he relied on the opinions of others.  He

contends that he did not determine the accounting for the AOL transaction, and that both internal

and external reviewers determined what rules to apply and how to apply them.  Again, it is

Leslie's direct statements to the Ernst & Young auditors that support the SEC's claim.  The fact

that others approved the accounting did not relieve Leslie of his responsibility to provide accurate

1    answers in response to Ernst & Young's inquiry.

2          Defendants argue collectively that they did not have any motive to make

3    misrepresentations to Ernst & Young because Veritas was exceeding investor expectations even

4    without the AOL transaction. This certainly is relevant evidence with respect to their intent, but

5    "[t]he SEC is not required to prove scienter at trial through evidence of motive." *SEC v. KPMG*

6    *LLP*, 412 F. Supp. 2d 349, 382 (S.D.N.Y. 2006). To hold otherwise "inappropriately makes the

7    scienter issue one of 'what did the defendant want to happen' as opposed to 'what could the

8    defendant reasonably foresee as a potential result of his action.'" *Id.* (quoting *AUSA Life Ins. Co.*

9    *v. Ernst & Young*, 206 F.3d 202, 221 (2d Cir. N.Y. 2000)). *See also Siracusano v. Matrixx*

10   *Initiatives, Inc.*, 585 F.3d 1167, 1182 (9th Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues &*

11   *Rights, Ltd.*, 551 U.S. 308, 324 (2007) ("The Supreme Court has stated, however, that, '[w]hile it

12   is true that motive can be a relevant consideration, and personal financial gain may weigh heavily

13   in favor of a scienter inference, we agree with the Seventh Circuit that the absence of a motive

14   allegation is not fatal.'"). Even without evidence of motive, the SEC's evidence permits the

15   inference that Leslie knew that his statements to Ernst & Young would affect the revenue

16   recognition of the AOL transaction, thereby permitting the inference that Leslie foresaw that

17   Ernst & Young would be misled.

18          **d.     Kenneth Lonchar**

19          The SEC alleges essentially that Lonchar, in his interactions with Ernst & Young,

20   misrepresented that (1) the transactions were separate and negotiated by separate individuals,  (2)

21   Veritas needed the AOL advertising to strengthen brand recognition, and (3) that the transactions

22   were valued fairly in SEC filings, a management representation letter to Ernst & Young, and

23   Veritas's internal records. Finally, the SEC alleges that Lonchar failed to disclose an oral

24   agreement that modified the written payment terms of the AOL transaction.

25          **i.     Lonchar's knowledge of the AOL Transaction**

26          Lonchar was involved in Defendants' discussion of AOL's proposal to increase the

27   licensing fee and to enter into an advertising agreement. Leslie testified that Laber called him to

28   propose the advertising deal. Leslie then directed Sallaberry to contact Jay Rappaport at AOL.

                                                33

1    (Leslie Investigative Testimony, SEC Opp'n to MSJ, Ex. 39 at 88:9-11.)  Sallaberry has testified

2    that, after speaking with Rappaport, he met with Leslie and Lonchar in person.  (Sallaberry

3    Investigative Testimony, SEC Opp'n to MSJ, Ex. 48 at 52:18-22.)  Sallaberry then "relay[ed] to

4    them the conversation we just had [the conversation with Rappaport.]"  (*Id.* at 53:13-14.)

5    According to Leslie, Sallaberry "outlined the $20 million shallower discounts to increase the

6    revenue by $20 million and advertising of $20 million."  (Leslie Investigative Testimony, SEC

7    Opp'n to MSJ, Ex. 39 at 89:8-11.)  While Sallaberry discussed Laber's proposal to increase the

8    price of the license by $20 million, neither Leslie, Lonchar, nor Sallaberry discussed whether the

9    terms of the license would change as a result of that price increase.  Sallaberry asked Lonchar

10   how to structure the overall transaction, and Lonchar told him to make two separate contracts and

11   that each party should pay cash.  (Sallaberry Investigative Testimony, SEC Opp'n to MSJ, Ex. 48

12   at 66:1-10.)  Leslie testified at his deposition that Lonchar was present at a meeting on October

13   2, 2000, and that he "[doesn't] believe that there was anything that [he] had knowledge of that

14   wasn't expressed in that meeting."  (Leslie Deposition, SEC Opp'n to MSJ, Ex. 29 at 361:7-12.)

15   The SEC presents evidence tending to show that Leslie knew of the last-minute change in price,

16   and the same evidence permits the inference that Lonchar also knew these details.

17           After the written agreement was signed, there was a dispute as to when AOL needed to

18   pay Veritas for the license.  Under the written terms of the agreement, Veritas was required to

19   pay $20 million to AOL within thirty days of signing the agreement.  (Lonchar's Reply in

20   Support of Mot. for Partial SJ, Ex. 15 at 175.)  Because the agreement was signed on September

21   29, 2000, Veritas's payment was due under the terms of the agreement by October 29, 2000.  The

22   written terms also provided that AOL was to pay within thirty days of the invoice.  (*Id.*)  AOL

23   had refused to pay before December 1, 2000, which concerned Veritas employees.  (SEC's

24   Opp'n to MSJ, Ex. 79.)  On November 14, 2000, Veritas had not yet paid AOL for the

25   advertising purchase, and Sallaberry copied Lonchar on an email to Michael Cully in which

26   Sallaberry said, "Jay Rappaport and I agreed to do a simultaneous wire transfer."  (SEC's Opp'n

27   to MSJ, Ex. 79.)  It appears that Vertias and AOL exchanged payments on December 1, 2000.

28   (SEC's Opp'n to MSJ, Ex. 80.)

1      **ii.      Separate transactions negotiated by separate individuals**

2          The SEC offers the deposition of Ernst & Young auditor David Price to support its

3   contention that Lonchar misrepresented the contingent nature of the transaction.  Price has

4   testified that "I recall Mr. Lonchar indicating that his belief was no, they were two separate

5   transactions negotiated by separate individuals in the company for separate business purposes."

6   (Price Investigative Testimony, SEC's Opp'n to MSJ, Ex. 46 at 31:18-21.)  The SEC also has

7   presented evidence tending to show that Lonchar understood that the transactions were not

8   separate.  Lonchar knew that Sallaberry was involved in the negotiation of both contracts because

9   Lonchar participated in a discussion with Leslie and Sallaberry about the details of the AOL

10  transaction and how to structure it.  Lonchar also knew of the simultaneous payment provision,

11  that the price of the license had increased at the eleventh hour to correspond exactly to the price

12  of the advertising purchase, and that the price of the licensing agreement increased without

13  changes to the terms of the license.  Defendants argue that the actual terms of the advertising

14  agreement were not set on September 29, 2000 but actually were negotiated later by other Veritas

15  employees.  However, viewed in the light most favorable to the SEC, Lonchar's statement still

16  was misleading, as it omitted the fact that Sallaberry was involved in negotiating the terms of

17  both the license and the advertising purchase on September 29, 2000.

18      **iii.      The need for advertising**

19          The SEC has not presented evidence that suggests that Lonchar was familiar with

20  Veritas's advertising needs.  Lonchar was the CFO of Veritas and would not necessarily have

21  been aware of Veritas's marketing plans.  Though Lonchar may have told the auditors that

22  Veritas had a need for $20 million in advertising, the SEC's evidence does not suggest that (1) he

23  did not actually believe the statement, (2) there was no reasonable basis for such a belief, or (3)

24  Lonchar was aware of undisclosed facts tending seriously to undermine the statement's accuracy.

25      **iv.      Fair value of the contracts**

26          Lonchar recorded the AOL transaction as a $50 million license and a $20 million

27  advertising purchase.  (SEC's Opp'n to MSJ, Ex. 81.)  He also signed a management

28  representation letter that stated that both the license and the advertising purchase were recorded

35

at "fair value" at $50 million and $20 million, respectively.  (SEC's Opp'n to MSJ, Ex. 106 at 2.)

Lonchar signed Veritas's Form 10-K for the 2000, and in August 2002, he certified the accuracy

of Veritas's financial statements from 2001 and parts of 2002 pursuant to Sarbanes-Oxley.  (*See*

SEC's Opp'n to MSJ, Exhs. 62, 83, and 94.)  The SEC alleges that all of this conduct was

misleading.

Lonchar "has held a Certified Public Accountant license in Idaho, but that license is

inactive." (Lonchar's Answer at ¶ 6.)  To qualify as a CPA, an individual must pass the Uniform

Certified Public Accountant Examination.  It is not clear whether the concept of "fair value" was

tested at the time Lonchar sat for the examination.  In 2006, the Financial Accounting Standards

Board ("FASB") published Financial Accounting Standards No. 157 ("FAS 157"), entitled "Fair

Value Measurements."  FAS 157 attempted to provide a definition for "fair value" and a

framework for measuring fair value under GAAP.  *See* Statement of Financial Accounting

Standards No. 157, P 2 (Fin. Accounting Standards Bd., September 2006).  The FASB noted that,

"[p]rior to this statement, there were different definitions of fair value and limited guidance for

applying those definitions in GAAP." *Id.*  The SEC has not presented evidence with respect to

Lonchar's understanding of the term "fair value." As discussed above, Veritas initially proposed

the license at $64 million, (Leslie's MSJ, Ex. L at 6), and the SEC's evidence does not show

either that Lonchar believed that $50 million was not a "fair" value of the license or that he had

reason to doubt that the price was not "fair."  Also, the SEC has not presented evidence with

respect to Lonchar's knowledge of Veritas's advertising needs, and thus it cannot demonstrate

that Lonchar did not actually believe that the advertising was worth $20 million, that he lacked a

reasonable basis for such a belief, or that he was aware of undisclosed facts tending seriously to

undermine that statement's accuracy.

### v.    Evidence of recklessness

The SEC presents evidence that suggests that Lonchar was aware of the controversy

surrounding these deals.  Leslie received an email from Brooks asking that he be "extra cautious"

with the revenue recognition of "the recent large transaction" because "a single revenue

recognition taint can utterly destroy a stock."  (SEC's Opp'n to MSJ, Ex. 32.)   On October 5,

36

1   2000, Leslie forwarded this email to Lonchar. (*Id.*)  In addition, Cherrstrom told Lonchar that

2   unless Veritas could provide support for the fair value of the software license or the advertising

3   purchase, the license would be recorded at $30 million with zero value assigned to the

4   advertising. (Cherrstrom Investigative Testimony, SEC's Opp'n to MSJ, Ex. 47 part 1 at 50:23-

5   51-7.)  This evidence permits an inference that Lonchar knew that his statements to the auditors

6   could influence the accounting of the AOL transaction.  Given that this was the largest

7   transaction in the history of Veritas, this evidence also permits the inference that the danger of

8   misleading buyers or sellers was so obvious that Lonchar must have been aware of it.

9   **e.      Paul Sallaberry**

10      The SEC alleges that Sallaberry misled the Ernst & Young auditors by (1) telling the

11  auditors that the licensing agreement was not conditioned upon the advertising purchase, (2)

12  denying involvement in negotiating the advertising purchase, and (3) representing that the $50

13  million price of the licensing agreement was reasonable.

14  **i.      Sallaberry's knowledge of the AOL transaction**

15      As discussed above, the SEC presents evidence that Sallaberry negotiated the price of

16  both the licensing agreement and the advertising purchase.  (Leslie Investigative Testimony, SEC

17  Opp'n to MSJ, Ex. 39 at 89:1-13.)  Sallaberry already was aware of the proposed $30 million

18  license.[18]  On September 29, 2000, Sallaberry spoke with Jay Rappaport about a price increase

19  for the license and the advertising purchase.  (*Id.* at 89:1-3.)  Sallberry communicated these terms

20  to Leslie, including the $50 million price of the licensing agreement and the $20 million for

21  advertising.  (*Id.* at 89:5-13.)  In addition, as discussed above, Sallaberry agreed to a

22  simultaneous payment term that was not included in the written contract.  (*See* SEC's Opp'n to

23

24          [18]  Sallaberry must have known of the $30 million proposal because his approval of a deal
25  at that price was necessary.  (Gary Florence Deposition, SEC's Opp'n to MSJ, Ex. 3 at 145:17-
    21.)  An executable agreement for a $30 million license already had been provided to AOL
26  before Sallaberry and Rappaport negotiated the price increase.  (*See* Laber Investigative
    Testimony, SEC's Opp'n to MSJ, Ex. 108 at 139:18-21 (Laber testifying that he physically
27  signed the $30 million licensing agreement on September 29, 2000 because he didn't think
    Veritas would agree to the advertising deal).)  In order for Veritas to have provided AOL with an
28  executable contract, Sallaberry must have approved the deal at $30 million.

37

1  MSJ, Ex. 79 (showing Sallaberry's awareness of the simultaneous payment provision) and

2  Lonchar's Reply in Support of Partial SJ, Ex. 15 at 175 (Ernst & Young auditor Cherrstrom

3  stating that he was unaware of the simultaneous payment term, indicating that it was not included

4  in the written contract).)  When he was informed that Veritas might offer AOL a $100,000

5  discount if AOL paid before December 1, 2000, Sallaberry insisted that AOL pay in accordance

6  with the simultaneous payment term instead.  (SEC's Opp'n to MSJ, Ex. 79.)

7                    **ii.    Whether the licensing agreement was conditioned on the
                              advertising agreement**

8
9          Sallaberry spoke with Ernst & Young auditor David Price.  Price provided the following

   testimony during the SEC's investigation:

10
11     A:    Well, I indicated before we asked Mr. Sallaberry a similar question as we asked
             Mr. Lonchar and Mr. Cully, was the software sales transaction contingent upon or
             connected with the advertising arrangement.

12
13     Q:    And what did Mr. Sallaberry say?

14     A:    He indicated no.

15  (Price Investigative Testimony, SEC's Opp'n to MSJ, Ex. 46 at 53:17-22.)  Sallaberry negotiated

   the license and the advertising purchase together and agreed to the simultaneous payment

16  provision, supporting an inference that he understood that the agreements were contingent.

17  Defendants dispute the implications of this evidence, but this only creates a dispute of material

18  fact.  Viewed in the light most favorable to the SEC, the evidence suggests that Sallaberry

19  understood that the licensing deal was contingent upon the advertising purchase.

20                    **iii.    Involvement in the negotiation**

21         As discussed above, the SEC has proffered evidence tending to show that Sallaberry was

22  involved in negotiating at least the price of both the license and the advertising purchase.  (Leslie

23  Investigative Testimony, SEC Opp'n to MSJ, Ex. 39 at 89:1-13.)  Price has testified as follows:

24     Q:    [D]id he comment on his role of the negotiations of advertising?

25     A:    No, he did not.  He indicated he was not involved.

26     Q:    [H]e made that definitive statement, "I wasn't involved in that negotiation?"

27     A:    In fact, yes.  We asked him whether he was involved and he indicated no.

28
                                              38

1    Q:    Did he say who was?

2    A:    As I recall, he indicated the marketing department was involved in the transaction.

3  (Price Investigative Testimony, SEC's Opp'n to MSJ, Ex. 46 at 49:18-50:2.)  Price also has

4  testified that "Mr. Sallaberry said that the software license contract was negotiated separately."

5  (Price Deposition, SEC's Opp'n to MSJ, Ex. 37 at 169:17-18.)  Sallaberry contends that people

6  in the marketing department were involved in negotiating the actual terms of the advertising that

7  AOL was to offer.  While this may be true, there also is evidence that Sallaberry was involved in

8  negotiating the price of the advertising purchase on September 29, 2000.  Viewing the evidence

9  in the light most favorable to the SEC, Sallaberry's statement that he was not involved in the

10  negotiations was misleading.

11                              **iv.    Fairness of the price**

12            Sallaberry indicated to Ernst & Young that the $50 million price of the licensing

13  agreement, which represented a forty-two percent discount of the typical price of the software,

14  was fair.  (Sallaberry Investigative Testimony, SEC's Opp'n to MSJ, Ex. 48 at 240:5-11

15  (Sallaberry discussing his conversation with Ernst & Young, recalling that "we talked about was

16  42 percent a fair discount").)  Sallaberry, who has no training in accounting principles, argues

17  that he believed subjectively that $50 million was a fair price for the software license.  The

18  evidence suggests that Sallaberry knew that the price of the license had increased without any

19  changes to its terms.  (Sallaberry Investigative Testimony, SEC's Opp'n to MSJ, Ex. 48 at 82:10-

20  83:14 (Sallaberry and Rappaport agreed to the $20 million advertising purchase, but there were

21  still some "outstanding issues" to work out).)  Sallaberry also knew that Veritas had paid

22  commissions to the sales team on the AOL transaction and that the commissions were based on

23  the $30 million price.  (Sallaberry Deposition, SEC's Opp'n to MSJ, Ex. 19 at 228:12-13.)

24            Nonetheless, the SEC has not pointed to evidence that suggests that Sallaberry (1) did not

25  believe that the license was worth $50 million, (2) lacked a reasonable basis for such a belief, or

26  (3) was aware of undisclosed facts tending seriously to undermine the statement's accuracy.  The

27  $50 million price appears reasonable in the context of Veritas's initial offer for the license at $64

28  million.  (Leslie's MSJ, Ex. L at 6.)  Moreover, Sallaberry directed his sales team to collect,

Case No. C 07-3444
ORDER (1) DENYING MOTION TO SEVER ETC.
(JFEX1)

1   prepare, and submit documents to support the $50 million purchase price.  (Price Investigative

2   Testimony, SEC's Opp'n to MSJ, Ex. 46 at 145.)  The SEC has not shown that this

3   documentation contained inaccuracies or misleading statements.  While Sallaberry knew that the

4   commissions were paid based on the $30 million price, that decision was made by Leslie,

5   (Sallaberry Deposition, SEC's Opp'n to MSJ, Ex. 19 at 229:7-12), and this fact alone is

6   insufficient to support a reasonable inference that Sallaberry lacked a reasonable basis for his

7   belief or was aware of facts that seriously undermined the accuracy of his statement.

8                              **v.    Evidence of recklessness**

9           Before September 29, 2000, Sallaberry had experience with deals similar to the AOL

10  transaction.  On September 26, 2000, when asked a question regarding an agreement with Disney

11  that included both a license and an advertising purchase, Sallaberry responded that, "[I]'m

12  worried about rev rec [revenue recognition] if we commit to advertising in the contract."  (SEC's

13  Opp'n to MSJ, Ex. 21.)  When discussing the potential AOL transaction with Leslie and Lonchar

14  before it was signed, Sallaberry asked Lonchar how to structure the deal to "make sure that [he]

15  did it correctly from a revenue recognition perspective, you know, the right way to do a

16  legitimate business deal."  (Sallaberry Investigative Testimony, SEC's Opp'n to MSJ, Ex. 48 at

17  57:3-6.)  This evidence permits the inference that Sallaberry knew that revenue recognition for

18  deals of this nature was controversial.  If Sallaberry did make misrepresentations to Ernst &

19  Young, the danger of misleading buyers or sellers was so obvious that Sallaberry must have been

20  aware of it.  Sallaberry's argument that he was relying on the advice of others cannot excuse any

21  misstatements that he made personally to the Ernst & Young auditors.  Although Sallaberry

22  asserts that he is not familiar with accounting rules, the SEC's evidence suggests that he knew

23  the details of the AOL transaction and recklessly made statements that conflicted with his

24  knowledge of the transaction.

25          **2.    Actual knowledge of violations for aiding and abetting liability**

26          In order to prevail on its claims for aiding and abetting, the SEC must show that the

27  Defendants had actual knowledge of the primary violations and their own role in furthering the

28  violations.  *Leslie*, 2008 WL 3876169, at *7.  While the evidence discussed above may be

                                              40

1   sufficient to support a finding that Defendants acted with scienter when making certain

2   misrepresentations, the evidence is insufficient to establish that Defendants knew that recording

3   the license at $50 million and the advertising purchase at $20 million in fact was improper.  The

4   accounting rules are undeniably complex, and the SEC has not directed the Court's attention to

5   any evidence showing that Defendants not only knew of the relevant accounting principles but

6   also knew how to apply them correctly.

       **3.**　　**Knowingly failing to implement a system of internal accounting controls**

8          The SEC asserts that Lonchar knowingly failed to implement a system of internal controls

9   under Exchange Act Section 13(b)(5) and aided and abetted violations of Exchange Act Section

10  13(b)(2)(B).  The SEC has not identified the specific controls that were insufficient or that are

11  needed.  *See SEC v. Berry*, 580 F. Supp. 2d 911, 924-25 (N.D. Cal. 2008) (dismissing a claim for

12  internal control violations for not stating what controls were insufficient or circumvented).

13  Moreover, the SEC has not pointed to evidence that could suggest that Lonchar knowingly failed

14  to implement a system of internal controls.  While the evidence may show that Lonchar acted

15  recklessly and could have suspected that a system of internal controls was necessary, the

16  evidence does not suggest that Lonchar *knew* that he had failed to implement a system of internal

17  controls.  Courts routinely have found that certain sections of Rule 13(b) do not require scienter.

18  *See S.E.C. v. McNulty*, 137 F.3d 732, 740 (2d Cir. 1998).  However, while *McNulty* and the cases

19  cited therein address 17 C.F.R. §§ 240.13b2-1 and 240.13b2-2, the cases do not address the plain

20  language of Section 13(b)(5), which requires "knowingly circumvent[ing] or knowingly fail[ing]

21  to implement a system of internal accounting controls."  15 U.S.C.A. § 78m(b)(5).  Even in the

22  light most favorable to the SEC, the evidence in the record does not support a finding that

23  Lonchar acted knowingly.  The SEC's allegation that Lonchar aided and abetted violations of

24  Exchange Act Section 13(b)(2)(B) fails for similar reasons.  The SEC has not demonstrated that

25  Lonchar knew of the primary violations.

       **4.**　　**Evidence of scienter is sufficient to support the remaining claims**

27         As discussed above, the SEC's evidence permits the inference that Defendants acted with

28  scienter when making certain misstatements.  This same evidence is sufficient to support the

41

1   SEC's claims for violations of Rule 13b2-2 for making misleading statements to an accountant.

2   Each Defendant knew that the Ernst & Young auditors were engaged in the process of evaluating

3   Veritas's revenue recognition with respect to the AOL transaction, and there is evidence that

4   Defendants recklessly made misstatements to the auditors.  These misstatements also are

5   sufficient to support the mental state required by the SEC's claims under Rule 13b2-1 for

6   falsifying a record.  Defendants each had contact with the auditors and were aware that their

7   statements to the auditors could affect the Veritas's revenue recognition records.[19]  Finally, the

8   evidence also is sufficient to support a finding of negligence in connection with the SEC's claims

9   under Section 17(a)(2) and (a)(3).  Because the evidence is sufficient to support a finding that

10  Defendants acted with scienter, it follows that the same evidence would support the conclusion

11  that Defendants acted negligently.

12  **B.   Materiality**

13      "Materiality depends on the significance that a reasonable investor would assign to the

14  withheld or misrepresented information."  *U.S. v. Reyes*, 577 F.3d 1069, 1075 (9th Cir. 2009)

15  (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)).  "To be material, 'there must be a

16  substantial likelihood that the disclosure of the omitted fact would have been viewed by the

17  reasonable investor as having altered the 'total mix' of information made available.'" *Id.* (quoting

18  *Basic*, 485 U.S. at 231-32).  "In a securities fraud action, '[m]ateriality and scienter are both

19  fact-specific issues which should ordinarily be left to the trier of fact,' although 'summary

20  judgment may be granted in appropriate cases.'" *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir.

21  _____

22  [19] To the extent that the SEC also asserts that Defendants' conduct violated Section
    13(b)(5), which makes it a violation to "knowingly falsify any book, record, or account", these
23  claims fail.  As with the SEC's allegations regarding internal accounting controls, Section
    13(b)(5) plainly requires that a defendant act "knowingly".  Even in the light most favorable to
24  the SEC, the evidence does not support a finding that Defendants *knew* that their misstatements
    would result in the falsification of a record.  This is a different standard than that in Rule 13b2-1,
25  which at most requires recklessness.  *SEC v. Jorissen*, 470 F. Supp. 2d 764, 771 ( E.D. Mich.
    2007) (quoting *S.E.C. v. Orr*, No. 04-74702, 2006 WL 542986 at *16 (E.D. Mich. Mar. 6, 2006)
26  (Roberts, J.) for the proposition that "'[p]laintiff must … show that the defendant acted
    unreasonably' for liability under Rule 13b2-1").
27

28

42

Case No. C 07-3444
ORDER (1) DENYING MOTION TO SEVER ETC.
(JFEX1)

1   1994) (citation omitted).  Claims under   Section 17(a)(1) and (a)(2), Section 10(b)(5) and Rule

2   10b-5, and Rule 13b2-2 explicitly require a showing that the misstatement was material.

3          Defendants make two arguments as to why the misstatements were immaterial.  First,

4   they contend that the SEC cannot show that the error in the accounting of the AOL transaction

5   would have been important to a reasonable investor's purchasing decisions.  Second, they argue

6   that either Ernst & Young's original accounting for the transaction was correct or the

7   misrepresentations did not affect the way in which Ernst & Young originally accounted for the

8   transaction.  As an initial matter, the SEC argues that a restatement always is material because

9   "under Generally Accepted Accounting Principles ('GAAP'), a restatement issues only when

10  errors are material."  *SEC v. Kelly*, 663 F. Supp. 2d 276, 284 (S.D.N.Y. 2009).  However,

11  information that is quantitatively and qualitatively material to an accountant under GAAP

12  principles is not necessarily information that is important to a reasonable investor.

13         **1.     Importance to a reasonable investor**

14         In March 2003, Veritas restated its financials in connection with the AOL transaction.

15  Defendants argue that the effect of the restatement is immaterial as a matter of law.  Veritas filed

16  a Form 8-K regarding the restatement which described the following:

17  •      For the year 2000:

18         •      Revenue decreased from $1,207 million to $1,190 million (1.4%)

19         •      Net losses increased from $620 million to $627 million (1.1%)

20  •      For the year 2001:

21         •      Operating expenses decreased from $1,812 million to $1,799 million (0.7%)

22         •      Net losses decreased from $651 million to $643 million (1.2%)

23  •      For nine months of 2002:

24         •      Revenue decreased from $1,101 million to $1,100 million (0.1%)

25         •      Net income, previously reported at $107 million, decreased by less than $1

26                million ( 0.9%).

27  •      "The restatement ha[d] no effect on the Company's cash position"

28  (Sallaberry's MSJ, Ex. 65 at 4.)

43

1    The SEC's accounting expert, Dr. Seidler, provides a decidedly different picture of the

2    effects of the 2003 restatement on Veritas's financials in the fourth quarter of 2000:

3    •    Total revenues decreased $19.2 million (five percent)

4    •    Licensing revenues decreased by six percent

5    •    Net losses increased by $8.1 million (six percent)

6    (Seidler report at 14.)  Seidler concluded that, from an accounting perspective, the changes were

7    quantitatively material because the effects exceeded the five percent threshold established by the

8    accounting authority Montgomery's Auditing.  (*Id.* at 9.)  Seidler also concluded that the changes

9    were qualitatively material because of the circumstances of the restatement, focusing on the

10   allegations that management had misled the auditors.  (*Id.* at 7.)  It is important to highlight two

11   aspects of Seidler's opinion.  First, the opinion speaks only to *accounting* materiality: that is,

12   whether the change in the treatment of the AOL transaction was material to an accountant, not

13   with respect to whether it was important to a *reasonable investor*.  Evidence of accounting

14   materiality may be relevant to the question of legal materiality, but is not dispositive.  Second,

15   while both the Form 8-K and Seidler's report comment on the effects on the restatement, it is

16   clear that these documents are comparing two different things.  The Form 8-K looks at 2000 as a

17   whole, while Seidler only looks to the fourth quarter of that year.

18   The SEC also offers the expert report of Mr. Davis, who opines on the importance of the

19   restatement to reasonable investors.  On November 14, 2002, Veritas disclosed that the SEC had

20   subpoenaed its records related to the AOL transaction.  It also disclosed the amounts in question.

21   Based on news articles from November 15, 2002, Davis concluded that there was sufficient

22   information to cause reasonable investors to conclude that Veritas would restate the AOL

23   transaction.  Davis performed an event study and concluded that the restatement of the AOL

24   transaction was material because there was a statistically significant decrease in the share price

25   on November 15, 2002.[20]

26   Predictably, Defendants' experts characterize the situation differently.  Mr. O'Bryan

27

28

_____

[20]  The November 14, 2002 disclosure was released after the market closed.

44

opines on the correctness of the original accounting for the AOL transaction, but he does not appear to offer an opinion on the effect of the restatement to reasonable investors.  Mr. Berquist has offered such an opinion.  Berquist concludes that the restatement was not material because it did not impact meaningfully Veritas's earnings per share ("EPS") or its ability to exceed the First Call EPS estimate.[21]  Berquist states that he considered "Pro Forma EPS," which excludes one-time expenses such as those for acquisitions, restructuring, stock options, and amortization of intangible assets, and found that Veritas's restatement of the AOL transaction had the following effects:

- The 2000 Pro Forma EPS decreased from $0.60 to $.059 (1.67%)
- The 2001 Pro Forma EPS increased from $0.67 to $0.69 (2.90 %)
- The First Call EPS estimate for Veritas's December 2000 Pro Forma EPS was $0.17
- The December 2000 Pro Forma EPS decreased from $0.19 to $0.18 (5.26%)

(Berquist's report at 7,  9.)

"As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case."  *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1116 (9th Cir. 1989) (citing *Bieghler v. Kleppe*, 633 F.2d 531, 534 (9th Cir.1980). However, insignificant misstatements are not material as a matter of law.  *See Parnes v. Gateway 2000*, 122 F.3d 539, 547 (8th Cir. 1997) (finding that "a reasonable investor, faced with a high-risk/high-yield investment opportunity in a company with a history of very rapid growth, would not have been put off by" a two-percent overstatement of assets); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 715 (3d Cir. 1996) (finding a misstatement of 1.2% of assets for one quarter to be immaterial); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003) (finding a misstatement of 0.3% of total revenues for a two-year period to be immaterial); *In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 171 (D. Mass. 2000) (finding a misstatement of 2.6% of the company's sales for the year to be too insignificant and non-

---

[21]  First Call is a third-party service that averages and reports the EPS estimates of various sources.

Case No. C 07-3444
ORDER (1) DENYING MOTION TO SEVER ETC.
(JFEX1)

1  systemic to be material); *In re Convergent Technologies Second Half 1984 Securities Litigation*,

2  C-85-20130-SW, 1990 WL 606271, at *10-11 (N.D. Cal. Jan. 10, 1990) (finding a misstatement

3  of less than 1.5% of net operating revenues for the quarter to be immaterial because the company

4  exceeded investor expectations by $0.04 per share for the quarter and then recognized a "huge

5  one time loss" of $0.28 per share); *Pavlidis v. New England Patriots Football Club, Inc.*, 675

6  F.Supp. 688, 692 (D.Mass. 1986) (finding an increase of less than one percent in the yearly

7  operating revenue to be "trivial" and "immaterial").

8    Given the specific facts of this transaction, the Court is reluctant to conclude as a matter

9  of law that the 2003 restatement was not material.  The SEC and Defendants each have experts to

10  support their positions.  At the time, the AOL transaction was the largest transaction in Veritas's

11  history.  A misstatement of that transaction by forty percent could be important to a reasonable

12  investor.  The bulk of the transaction affected the fourth quarter of 2000, and reasonable

13  investors often are concerned both with yearly and quarterly results.

14    **2.    The original accounting for the AOL transaction**

15    Mr. O'Bryan opines that Ernst & Young's original accounting for the AOL transaction

16  was correct.  Dr. Seidler has submitted "opposition" to O'Bryan's report, in which he disagrees

17  with O'Bryan's conclusion.  Resolution of the experts' disagreement is best left to the trier of

18  fact.  *See In re Apple Computer Securities Litigation*, 886 F.2d at 1116.

19    Defendants also argue that their statements to Ernst & Young cannot be material because

20  Ernst & Young discredited the alleged misstatements in any event.  Ernst & Young noted that

21  Veritas's management had represented that the software licensing agreement was not contingent

22  on the advertising purchase.  (SEC's Opp'n to MSJ, Ex. 76 at 2.)  However, the auditors also

23  stated that "because of the proximity of execution of both arrangements between the parties, we

24  have considered these two transactions to be linked and part of a single exchange."  (*Id.*)

25  Defendants argue that, even if they had told Ernst & Young that the deals were contingent, the

26  original accounting treatment would not have changed.

27    In evaluating the AOL deal as a "linked" transaction, Ernst & Young attempted to justify

28  the value of either "leg" of the transaction.  If the value of one leg could be justified, Ernst &

46

1    Young would approve of the value of the other leg as well.  (Price Deposition, Lonchar's Mot.

2    for Partial SJ, Ex. 24 at 134:22-135:2.)  In this instance, after questioning Defendants in 2001,

3    Ernst & Young initially determined that valuing the license was too difficult because the terms of

4    the license provided AOL with unlimited access to certain Veritas software.  (Cherrstrom

5    Deposition, Lonchar's Mot. for Partial SJ, Ex. 4 at 17:8-10.)  Instead, Ernst & Young focused on

6    the advertising leg of the transaction.  Based on the information provided by Veritas and

7    Defendants, Ernst & Young concluded that $20 million appeared to be a fair value of the

8    advertising.  In 2002, Ernst & Young became aware that the price of the license had increased by

9    $20 million on the day the agreements were signed.  Knowing this information, Ernst & Young

10   sought information that would justify that price increase.  It concluded that the $20 million price

11   increase was not accompanied by changes to the license that could have justified the increase.

12   (Cherrstrom Investigative Testimony, SEC's Opp'n to MSJ, Ex. 47 at 95:9-16.)  Accordingly,

13   Ernst & Young withdrew its support for the original accounting of the AOL transaction.

14         The evidence permits the inference that the contents of Defendants' alleged

15   misrepresentations were material.  A reasonable investor could attach importance to whether or

16   not the license and the advertising purchase were contingent because the answer to that question

17   was at the heart of Ernst & Young's accounting treatment for a $50 million transaction.

18   Defendants' argument does not demonstrate that the alleged misstatements were unimportant to

19   reasonable investors, but rather that certain misstatements did not reach reasonable investors.

20   While the evidence supports an inference that Defendants misrepresented the contingent nature

21   of the AOL transaction, Ernst & Young discredited those statements.  When Ernst & Young

22   discredited the alleged misstatements, the contents of the statements did not reach the market or

23   affect the decisions of reasonable investors.  Ernst & Young's opinion with respect to the

24   accounting changed not because of its discovery of Defendants' alleged misrepresentations with

25   respect to the contingent nature of the transactions, but because of its discovery that the price of

26   the license increased by $20 million on the day the agreement was signed.  While this was

27   important because the license and the advertising purchase were linked transactions, the SEC has

28   not demonstrated that the auditors asked questions regarding the negotiation history when they

47

1  performed the pre-2002 audits.

2        A private plaintiff suing under Rule 10b-5 must demonstrate reliance on the alleged

3  misstatement and loss causation, i.e., that the misstatement is the proximate cause of the injury.

4  In this instance, Defendants' contend that their alleged misstatements were discredited and

5  therefore neither affected the audit nor reached the market.  However, the SEC need not show

6  reliance or loss causation.  *Gebhart*, 595 F.3d at 1041 n.8 ("In a private securities fraud action,

7  the plaintiff generally must prove five elements: (1) a material misrepresentation or omission of

8  fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) transaction and loss

9  causation; and (5) economic loss. [Citation.] Our focus here is on the elements that the SEC must

10  establish.  The fourth and fifth elements of a private claim are therefore inapplicable."); *see also*

11  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 769-70 (2008) (while

12  "[n]o member of the investing public had knowledge, either actual or presumed, of respondents'

13  deceptive acts during the relevant times," "[i]t is true that if business operations are used, as

14  alleged here, to affect securities markets, the SEC enforcement power may reach the culpable

15  actors.").

16  **C.    Record keeping violations**

17        The SEC alleges that Defendants violated Rule 13b2-1, which provides that "[n]o person

18  shall directly or indirectly, falsify or cause to by falsified, any book, record or account subject to

19  section 13(b)(2)(A) of the Securities Exchange Act."  17 C.F.R. 240.13b2-1.  While the evidence

20  supports an inference that Lonchar and Sallaberry made misstatements to the auditors, it does not

21  support an inference that the alleged misstatements affected Veritas records.  Indeed, the only

22  inference supported by the evidence as to Lonchar and Sallaberry is that they made misleading

23  statements with respect to whether the license and the advertising purchase were negotiated

24  separately or contingent upon each other.  As discussed above, Ernst & Young discredited any

25  such representations and treated the transactions as linked.  Thus, the alleged misstatements were

26  not incorporated into Veritas's financial records.  Any inaccuracies in the original accounting

27  therefore cannot be the result of these misstatements.

28        Leslie, however, is situated differently.  The evidence does support an inference that

                                                   48

1   Leslie acted with scienter when making misstatements that did affect the audit.  While all

2   Defendants represented that the license was valued fairly at $50 million, only evidence against

3   Leslie supports the inference that he believed that it was not valued fairly.  He described the deal

4   as a "gross up" and decided to pay commissions on $30 million rather than $50 million.  In

5   addition, there is evidence in the record that could support an inference that Leslie did not believe

6   that Veritas desired to purchase this magnitude of advertising from AOL.  Because the auditors

7   were searching for the fair value of either leg of the AOL transaction, a misstatement regarding

8   the fair value of the license or Veritas's interest in the AOL advertising could have affected the

9   audit and therefore Veritas's records.

10   **D.   Sallaberry's responsibility for the misrepresentations**

11         **1.   False Statements**

12         Sallaberry argues that he cannot be liable under Section 17(a)(2) or Rule 10b-5 because

13   he did not make a statement in connection with Veritas's public filings or sign the management

14   representation letter connected with Ernst & Young's audit for 2000.  Under Rule 10b-5, it is

15   unlawful for any person, "by the use of any means or instrumentality of interstate commerce, or

16   of the mails or of any facility of any national securities exchange,

17         (a) To employ any device, scheme, or artifice to defraud,

18         (b) To make any untrue statement of a material fact or to omit to state a material fact
         necessary in order to make the statements made, in the light of the circumstances under
19         which they were made, not misleading, or

20         (c) To engage in any act, practice, or course of business which operates or would operate
         as a fraud or deceit upon any person,

21             in connection with the purchase or sale of any security."

22   17 C.F.R. 240.10b-5.  Sallaberry rightly concedes that an actor who did not issue a public

23   statement still may be liable if there was "substantial participation or intricate involvement in the

24   preparation of fraudulent statements . . . even though that participation might not lead to the

25   actor's actual making of the statements."  *Howard v. Everex Sys.*, 228 F.3d 1057, 1061 n.5 (9th

26   Cir. 2000).  Sallaberry contends that he did not participate substantially in making any statement.

27   In fact, the only *public* statements identified by the SEC cannot support a claim against Lonchar

28

49

1  or Sallaberry in any event.  The evidence against Lonchar and Sallaberry supports only the

2  inference that they misled the auditors with respect to whether the license and the advertising

3  purchase were separately negotiated or contingent agreements.  As discussed above, the auditors

4  rebuffed any such representations, and the public statements and records did not incorporate

5  them.

6        However, the SEC's claims against Lonchar and Sallaberry are not necessarily predicated

7  on public statements.  Instead, the SEC alleges that Lonchar and Sallaberry made misleading

8  statements to Ernst & Young in connection with an audit that was sure to affect the valuation of

9  Veritas shares.  As discussed above, the SEC need not demonstrate that any investors relied on

10  the statements or even that the misstatements caused any loss in particular.  If Lonchar or

11  Sallaberry made an untrue statement of material fact in connection with the purchase or sale of a

12  security, they may be liable for a violation of Rule 10b-5.  The publication of the statement

13  appears to be irrelevant in an SEC enforcement action.

14        Sallaberry relies on *In re Cylink Secs. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal.

15  2001), in which the court concluded that a defendant who instructed his sales force to solicit a

16  deal for which revenue was incorrectly recognized was not liable because there was no allegation

17  that he was involved in the process of revenue recognition or the issuance of financial statements.

18   The SEC presents evidence that Sallaberry was involved in the process of revenue recognition

19  and had direct contact with outside auditors who were trying to valuate the AOL transaction.

20  The other cases upon which Sallaberry relies are distinguishable.  *See In re Gilead Scis. Secs.*

21  *Litig.*, No. C 04-0100 SI, 2009 WL 3320492 (N.D. Cal. Oct. 13, 2009) (ultimately dismissing a

22  complaint because it failed to allege with any specificity how the defendant was substantially

23  involved with the statement and no allegation could support a finding of scienter), *SEC v. Fraser*,

24  2009 WL 2450508, 2009 WL 2450508, at *8 (D. Ariz. Aug. 11, 2009) (dismissing a complaint

25  for failing to allege the nature of the defendant's involvement in reviewing and discussing SEC

26  filings, including whether the defendant suggested what the forms should state, or that any such

27  suggestion, if it occurred, was heeded), and *SEC v. Berry*, 580 F. Supp. 2d 911, 922 (N.D. Cal.

28  2008) (finding that "[t]he SEC's conclusory pleadings that [the defendant] 'reviewed' and

50

1    'discussed' various filings is insufficient to plead (with particularity) [the defendant's] role in the

2    purported fraud").  The SEC offers evidence that provides specific details of Sallaberry's

3    participation in the revenue recognition process.  *See McGann v. Ernst & Young*, 102 F.3d 390,

4    394 (9th Cir. 1996) (parenthetically quoting *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215,

5    1226 (10th Cir. 1996) for the proposition that accountants may be liable under anti-fraud laws if

6    they "make a false or misleading statement (or omission) that they know or should know will

7    reach potential investors").  The evidence is sufficient to create a genuine issue of material fact

8    with respect to whether Sallaberry or Lonchar acted with scienter when making misstatements

9    directly to Ernst & Young.

10          **2.    Scheme liability**

11          In the alternative, the SEC argues that Sallaberry may be held liable under Section

12   17(a)(2) and Rule 10b-5 under a scheme liability theory.  An actor is liable for participation in a

13   scheme to defraud if the actor "engaged in conduct that had the principal purpose and effect of

14   creating a false appearance of fact in furtherance of the scheme."  *Simpson v. AOL Time Warner*

15   *Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds sub nom. Avis Budget*

16   *Group, Inc. v. Cal. State Teachers' Ret. Sys.*, 128 S.Ct. 1119 (2008).  However, the alleged

17   conduct must be more than a reiteration of the misrepresentations that underlie the misstatement

18   claims.  *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 361 (D.N.J. 2009) (citation omitted).

19   Here, the SEC must point to evidence that Sallaberry engaged in conduct outside of his

20   interactions with Ernst & Young.

21          The SEC alleges that Sallaberry engaged in a scheme to inflate the revenue recognition of

22   the AOL transaction.  It argues that two of Sallaberry's actions had the principal purpose and

23   effect of creating a false appearance of fact in furtherance of that scheme.  First, in August 2002,

24   the San Jose Mercury News contacted Veritas and asked for comments on the AOL transaction.

25   Sallaberry was aware of this inquiry.  (Sallaberry Deposition, SEC's Opp'n to MSJ, Ex. 19 at

26   287:7-12.)  The statement given to the San Jose Mercury News stated that: "Unlike some

27   companies, VERITAS does not engage in 'swap' or 'barter' transactions.  In all of the

28   transactions you allude to, the revenue for VERITAS was paid in cash and the pricing to

51

customers was on normal commercial terms." (SEC's Opp'n to MSJ, Ex. 87 at VAOL 0002082.) Sallaberry testified that he was familiar with the term "barter transaction" and defined it as a transaction in which "you are selling something to someone and when they're buying something from you." (Sallaberry Investigative Testimony, SEC's Opp'n to MSJ, Ex. 48 at 59:24-25.) Sallaberry testified that he was instructed by Lonchar to make two separate contracts and that each party should pay cash. (Sallaberry Investigative Testimony, SEC Opp'n to MSJ, Ex. 48 at 66:1-10.) The SEC has not presented evidence with respect to the "normal commercial terms" for similar licenses of Veritas software. Accordingly, there is insufficient evidence in the record to support an inference that Sallaberry's statement to the San Jose Mercury News was a misrepresentation of the transaction.

In August 2002, Veritas launched an internal review of the AOL transaction in light of the newly-enacted Sarbanes-Oxley regulations. Sallaberry spoke with William Kelly ("Kelly"), a lawyer with Veritas's outside counsel at Davis Polk & Wardwell. Kelly recalls that:

> [H]e indicated that he was aware that the, you know, the transaction terms had changed at the end, that they had changed as a result of a conversation that had happened with Mark Leslie and not with him, and that he was not directly involved in the discussion with AOL. And so, he basically just said he didn't know what happened in the conversation.

(Kelly Investigative Testimony, SEC's Opp'n to MSJ, Ex. 42 at 120:18-24.) Sallaberry's statement to Kelly appears to be a misrepresentation. Leslie was involved in the conversation with AOL, but, according to both men, so was Sallaberry. A fact finder could infer that the principal purpose of Sallaberry's statement to Kelly was to create a false impression of the AOL transaction in furtherance of the misstatements made to Ernst & Young in 2001.

**E.      Application of the time bar of  28 U.S.C. § 2462 to the SEC's prayer for relief**

Leslie and Sallaberry argue that the SEC's request for civil monetary penalties and application of the director and officer bar are untimely pursuant to 28 U.S.C. § 2462. This Court previously concluded that "§ 2462 does apply to SEC actions." *Leslie*, 2008 WL 3876169 at *8 (citing 28 U.S.C. § 2462). "An action seeking civil penalties under § 2462 'shall not be entertained unless commenced within five years from the date when the claim first accrued.'" *Id.* "Under § 2462, a claim accrues on the date that a defendant allegedly violated the statute and not

on the date plaintiff discovered, or should have discovered, the alleged violation." *Id.* at *9

(citing to *FEC v. Williams*, 104 F.3d 237, 240 (9th Cir 1996)).

### 1.    Civil penalties

The SEC nonetheless argues that civil penalties are not time-barred, for two reasons.

First, it contends that it brought its action within five years of the last actions taken by Leslie and

Sallaberry in furtherance of the fraudulent scheme.  Second, it claims that the statute of

limitations is tolled by fraudulent concealment on the part of Leslie and Sallaberry.

### a.    Fraudulent scheme

The SEC argues that Leslie and Sallaberry engaged in a fraudulent scheme to inflate the

share price of Veritas.  The Court ruled previously that "the latest unlawful act alleged in the

complaint with respect to the AOL transaction occurred in 2000 and 2001, when Veritas initially

booked the transaction and when it first published financial statements reflecting the improperly

booked transactions. Later financials reflecting the improperly booked transactions are simply a

continuing ill-effect of the initial alleged violation and do not constitute separate violations."

*Leslie*, 2008 WL 3876169 at *9.  The SEC contends that Leslie's latest unlawful acts actually are

his sales of Veritas stock between February 14, 2001 and July 15, 2002.  Similarly, the SEC

contends that Sallaberry's latest unlawful acts are his stock sales between May 2, 2001 and

February 13, 2002.  Both allegations are included in the SEC's amended complaint.  Because

Sallaberry entered into to a seven-month tolling agreement with the SEC, the SEC argues that its

original complaint filed on July 2, 2007 was filed within the five-year statute of limitations.

The SEC relies upon *SEC v. Kelly*, 663 F.Supp.2d 276, 287-88 (S.D.N.Y. 2009), which

discusses the "continuing violation doctrine."  That doctrine applies when "a violation, occurring

outside of the limitations period, is so closely related to other violations, not time-barred, as to be

viewed as part of a continuing practice such that recovery can be had for all violations."  *Id.*

(internal citations omitted).  However, the application of the doctrine to Section 2462 has been

questioned.  *Leslie*, 2008 WL 3876169 at *9 n.14 (citing *SEC v. Jones*, No. 05 Civ. 7044(RCC),

2006 WL 1084276, at *4 (S.D.N.Y. April 25, 2006).  To the extent that the doctrine applies, "it

may not be predicated on the continuing ill-effects of the original violation; rather, it requires

continued unlawful acts." *Leslie*, 2008 WL 3876169 at *9.  Leslie and Sallaberry argue that any artificial inflation in stock price in 2002 was merely the continuing ill-effect of the original violations that accrued in 2001.

While the inflation of the stock price may have been a continuing effect of any original violations, the issue is whether subsequent sale of stock is a new violation, occurring outside the limitations period, that is closely tied with the original violations.  Under any scheme to inflate stock price, actually selling stock would appear to be the ultimate goal and thus closely tied to the original violation.  Arguably, the sale of stock at an artificially inflated price *adds* to any preexisting ill-effect in that it injures the new purchasers of the stock who paid the artificially inflated price.  However, selling stock on the market is not a face-to-face transaction, and the new purchaser would have been injured even if Leslie and Sallaberry had not sold their stock.  The new purchasers likely would have purchased someone else's stock for the same price on the open market.  Any purchase while the share price was inflated artificially thus is nothing more than the continuing ill-effect of the original violations.

### b. Tolling on the basis of fraudulent concealment

The SEC directs the Court's attention to *SEC v. Kearns*, 691 F. Supp.2d 601, 613 (D.N.J. 2010) (following the Seventh Circuit and purportedly the Ninth Circuit to hold that "claims bound by the limitations period in § 2462 but sounding in fraud are equitably tolled until the date of discovery, so long as the SEC pursued its claim with due diligence").  In *Williams*, 104 F.3d at 240, the Ninth Circuit followed *3M Co. v. Browner*, 17 F.3d 1453, 1461 (D.C. Cir.1994) in rejecting the "discovery rule," an approach in which claims for relief under 28 U.S.C. § 2462 begin to accrue only when the plaintiff knows or has reason to know of the injury that is the basis of the action.[22]  However, the Ninth Circuit also held that the period may be equitably tolled

---

[22]The Court recognizes that *Williams* and *Browner* did not involve fraud under securities laws.  However, this Court and others have found that the reasoning of *Browner* applies in securities cases. *See Leslie*, 2008 WL 3876169 at *9 n.13 (concluding that the discovery rule is "unworkable, outside the language of the statue, inconsistent with judicial interpretations of § 2462 . . . and incompatible with the functions served by the statue of limitations in penalty cases.") (quoting *Browner*, 17 F.3d at 1460).

1    when three conditions are met: "fraudulent conduct by the defendant resulting in concealment of

2    the operative facts, failure of the plaintiff to discover the operative facts that are the basis of its

3    cause of action within the limitations period, and due diligence by the plaintiff until discovery of

4    those facts." *Id.* at 240-41. The Court does not read *Williams* as providing for tolling of the

5    limitations period whenever a claim sounds in fraud. The Court declines to follow *Kearns* to the

6    extent that it is inconsistent with Ninth Circuit precedent.

7         "The Commission may prove the concealment element by demonstrating 'either that

8    [Defendants] took affirmative steps to prevent [discovery of the fraud] or that the wrong itself

9    was of such a nature as to be self-concealing.'" *SEC v. Jones,* 476 F. Supp. 2d 374, 382

10   (S.D.N.Y. 2007) (citing *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir.

11   1988) (marks in the original). Though the issue was raised in Leslie's and Sallaberry's moving

12   papers, the SEC's opposition papers make no attempt to argue that the fraud was self-concealing.

13   Instead, it contends that Leslie and Sallaberry took affirmative steps to prevent the discovery of

14   the fraud. In particular, the SEC alleges that both Leslie and Sallaberry acted to "conceal the

15   AOL transaction and its fraudulent nature" from the San Jose Mercury News in August 2002. It

16   also alleges that Sallaberry took affirmative steps in August 2002 to conceal the fraud by

17   misleading Veritas's outside counsel, Kelly, who was conducting an internal review of the AOL

18   transaction.

19        With respect to the allegations involving the San Jose Mercury News, as discussed above,

20   the allegations against Sallaberry are insufficient to create a material dispute as to whether

21   Sallaberry attempted to mislead the San Jose Mercury News. In addition, the SEC's opposition

22   is entirely devoid of factual allegations that Leslie actually misled the San Jose Mercury News.

23   With respect to the allegations involving Kelly, Sallaberry points out that equitable tolling in the

24   Ninth Circuit requires "fraudulent conduct by the defendant *resulting* in concealment of the

25   operative facts." *Williams*, 104 F.3d at 240 (emphasis added). Sallaberry contends that none of

26   his actions actually resulted in the concealment of operative facts. It was the price change that

27   was the key piece of information to the auditors, and Kelly testified that he knew of the price

28   change, irrespective of representations by Sallaberry. (*See* Kelly Investigative Testimony, SEC's

55

1   Opp'n to MSJ, Ex. 42 at 124:15-125:1) (describing that Lonchar told him that the price moved

2   from $30 million to $50 million).)

3   **2.    The director and officer bar**

4   "The Ninth Circuit has not addressed the point of whether a director and officer bar

5   constitutes a penalty for purposes of section 2462" but "the weight of authority [ ] holds either

6   that (1) injunctive relief such as a director and officer bar is equitable and not subject to any

7   statute of limitations, [citations], or (2) that the question is one for decision on a developed

8   record, based upon whether the evidence indicates that the relief is necessary to prevent future

9   wrongdoing, rather than merely to punish the defendant [citations]." *Leslie*, 2008 WL 4183939

10  at *3.  In its previous ruling, the Court was "convinced that the second approach – which turns on

11  a case-specific inquiry into the nature of the requested injunctive relief – is the wiser one." *Id.*

12  Under that approach, the determination of whether the director and officer bar is equitable or

13  punitive "turns on (1) the likelihood of recurrence of violations, and (2) the possible collateral

14  consequences of issuing an injunction." *Id.*

15  Leslie and Sallaberry argue that the likelihood of recurrence is low.  Leslie retired as CEO

16  of Veritas on December 31, 2000 and resigned from the board of directors on May 31, 2004.

17  Leslie subsequently was named as a defendant in a Brocade shareholder derivative suit, but the

18  claims against him were dismissed.  Otherwise, Leslie has not been accused of wrongdoing apart

19  from the present action.  He continues to serve as a director of various companies.  Sallaberry

20  contends that, outside of the instant allegations, he has never been involved in questionable

21  conduct and that his twenty-five year sales record otherwise is unblemished.

22  Both Leslie and Sallaberry also argue that the possible collateral consequences of an

23  injunction are high.  Leslie contends that a director and officer bar would stigmatize him and

24  affect his ability to both pursue professional opportunities and charitable and philanthropic

25  endeavors.  Sallaberry claims that an injunction would stigmatize him and impair his ability to

26  work with companies in Silicon Valley.  Relying on *SEC v. First Pacific Bancorp*, 142 F.3d

27  1186, 1194 (9th Cir. 1998), the SEC contends that the court should not consider the effects of the

28  bar on a defendant's charitable and philanthropic endeavors.  However, the Ninth Circuit's

56

1   analysis in that case appears to be highly fact-driven and is not a categorical ban on considering

2   such activities.

3        The SEC does not dispute the factual showing offered by Leslie and Sallaberry, instead

4   citing to *SEC v. Mercury Interactive*, No. C 07-2822 JF (RS), 2008 WL 4544443, at *4 (N.D.

5   Cal. Sept. 30, 2008), a case in which this Court declined a motion to dismiss the SEC's request

6   for a director and officer bar.  However, *Mercury Interactive* was decided on a motion to dismiss,

7   when the factual record had not been developed.  The instant case is in an entirely different

8   posture, and the Court does have the benefit of a fully-developed record.  As this Court noted

9   previously, "the question is one for decision on a developed record, based upon whether the

10  evidence indicates that the relief is necessary to prevent future wrongdoing, rather than merely to

11  punish the defendant."  *Leslie*, 2008 WL 4183939 at *3.  The SEC's assertion, in a footnote, that

12  "such a review should wait until trial, as there are genuine issues of material fact" is wholly

13  insufficient to withstand Leslie's and Sallaberry's motions for summary judgment on this point.

14  Accordingly, the Court determines that in this case the director and officer bar would be a

15  penalty.

16  **F.    Disgorgement**

17       "Under certain limited circumstances a district court may issue summary judgment on its

18  own motion."  *Portsmouth Square, Inc. v. Shareholders Protective Comm.*, 770 F.2d 866, 869

19  (9th Cir. 1985).  Most commonly, "[*s*]*ua sponte* summary judgment is appropriate where one

20  party moves for summary judgment and, after the hearing, it appears from all the evidence

21  presented that there is no genuine issue of material fact and the non-moving party is entitled to

22  judgment as a matter of law."  *Id.* (citing *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir.

23  1982)).  A district court also may grant summary judgment *sua sponte* in other situations, such as

24  in the context of a final pretrial conference:

25       If the pretrial conference discloses that no material facts are in dispute and that the
         undisputed facts entitle one of the parties to judgment as a matter of law, a summary
26       disposition of the case conserves scarce judicial resources. The court need not await a
         formal motion, or proceed to trial, under those circumstances.

27  *Id.*  In this instance, the parties have engaged in voluminous discovery, Defendants' moving

28

1  papers challenge the fundamental aspects of the SEC's claims against them, and the parties

2  appear to have submitted all of the relevant evidence they are capable of mustering.

3         Where a district court grants summary judgment in the absence of a formal motion, the

4  party against whom judgment is entered is "entitled to reasonable notice that the sufficiency of

5  his or her claim will be in issue." *Id*. (citing *Townsend v. Columbia Operations*, 667 F.2d at 849;

6  *Portland Retail Druggists Assoc. v. Kaiser Foundation Health Plan*, 662 F.2d 641, 645 (9th Cir.

7  1981)). "Reasonable notice implies adequate time to develop the facts on which the litigant will

8  depend to oppose summary judgment, *id.* (citing *Portland Retail*, 662 F.2d at 645), and "the party

9  against whom judgment was entered [must have] had a full and fair opportunity to develop and

10 present facts and legal arguments in support of its position" *Id.* (citing *Cool Fuel*, 685 F.2d at

11 312). While the instant motions do not address specifically the SEC's prayer for disgorgement,

12 resolving the issues that *are* raised in the instant motions also resolves the SEC's request for

13 disgorgement with respect to certain Defendants. Discovery closed on December 16, 2009, and

14 the SEC has disputed vigorously the arguments raised by Defendants. Accordingly, the Court

15 will address *sua sponte* the SEC's request for disgorgement.

16        "The district court has broad equity powers to order the disgorgement of 'ill-gotten gains'

17 obtained through the violation of the securities laws." *First Pac. Bancorp*, 142 F.3d at 1191

18 (citing *SEC v. Clark*, 915 F.2d 439 (9th Cir. 1990)). "Disgorgement is designed to deprive a

19 wrongdoer of unjust enrichment, and to deter others from violating securities laws by making

20 violations unprofitable." *Id*. (citing *Hateley v. SEC*, 8 F.3d 653, 655 (9th Cir. 1993); SEC v.

21 Rind, 991 F.2d 1486, 1491 (9th Cir. 1993)). As discussed above, even if the SEC demonstrates

22 that Defendants violated securities laws in connection with their statements to the Ernst & Young

23 auditors, the SEC has not presented evidence that supports an inference that Lonchar or

24 Sallaberry improperly affected the audit. The evidence supports only an inference that Lonchar

25 and Sallaberry misrepresented the contingent nature of the AOL transaction. Despite the alleged

26 misrepresentations, Ernst & Young treated the transactions as linked. To the extent that the

27 original accounting was incorrect and improperly inflated Veritas's share value, this was a result

28 of Ernst & Young's failure to ask Lonchar and Sallaberry questions about the negotiation history

1    and not the result of misrepresentations with respect to whether the transactions were linked.

2    Because their conduct was not the cause of the inflation in the value of Veritas shares, Lonchar

3    and Sallaberry could not have received any unjust enrichment as a result of that inflation in share

4    value.  The amount ordered to be disgorged at least must be a reasonable approximation of the

5    profits causally connected with the violation.  *First Pac. Bancorp*, 142 F.3d at 1192 n.6 (citing

6    *First Jersey*, 101 F.3d at 1475).  Because there is no evidence that Lonchar or Sallaberry have

7    received profits in connection with their alleged misrepresentations, disgorgement is

8    inappropriate.

9         Again, however, Leslie is situated differently.  The evidence permits the inference that

10   Leslie acted with scienter when providing misstatements regarding the fair value of the license

11   and Veritas's need for the AOL advertising.  The auditors were searching for the fair value of

12   either leg of the AOL transaction, and it is conceivable that the outcome of the audit was affected

13   by either of these misstatements.  If the error in the original accounting resulted in an improper

14   inflation of Veritas's share value, Leslie may have been unjustly enriched as a result.

15                              **V. DISPOSITION**

16        Good cause therefor appearing:

17        (1)     Defendants' motion to sever will be denied;

18        (2)     Defendants' motion to exclude Dr. Seidler's testimony will be granted in part and

19                denied in part.  Seidler may testify at trial regarding accounting materiality, but

20                not at to legal concepts and case law, statutes, or whether specific conduct was

21                fraudulent, intentional, or misleading;

22        (3)     Sallaberry's motion to exclude Davis's testimony will be denied.  Lonchar's

23                motion to exclude portions of Davis's report will be granted.  Davis may testify at

24                trial regarding the 2003 restatement but not the 2004 restatement;

25        (4)     Defendants' motions for summary judgment and partial summary judgment will

26                be granted in part and denied in part.  The motions will be granted with respect to

27                the SEC's third claim for relief against Lonchar and Sallaberry (record-keeping

28                violations under Rule 13b2-1), its fourth claim for relief with against Lonchar

59

1   (internal control violations under Section 13(b)(5)), and its sixth claim for relief

2   against all Defendants (aiding and abetting reporting violations of Exchange Act

3   §§ 13(a) and 13(b)(2)(A) and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13

4   and 13b2-1).  Leslie's and Sallaberry's motions related to the SEC's prayer for

5   civil penalties and the director and officer bar also will be granted; and

6   (5)   Summary judgment is granted in favor of Lonchar and Sallaberry with respect to

7   the SEC's prayer for disgorgement.

8

9   **IT IS SO ORDERED**

10

DATED: 7/29/2010

11                                                    _____
                                                      JEREMY FOGEL
12                                                    United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 07-3444
ORDER (1) DENYING MOTION TO SEVER ETC.
(JFEX1)