\*\*E-Filed 1/13/2012\*\*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

SECURITIES AND EXCHANGE COMMISSION,

          Plaintiff,

   v.

MARK LESLIE, et al.,

          Defendants.

Case No. 5:07-cv-03444-JF (PSG)

**ORDER DENYING DEFENDANT LONCHAR'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

[re: dkt. entry 325]

      Defendant Kenneth E. Lonchar ("Lonchar") seeks partial summary judgment with respect to Claims One, Two, and Five asserted against him by Plaintiff Securities and Exchange Commission ("the SEC").[1]  Lonchar contends that to the extent that those claims are based upon his alleged "smoothing" of revenue and earnings, the SEC cannot prove the requisite element of legal materiality.  The Court has considered the briefing and admissible evidence, as well as the oral argument presented at the hearing on December 9, 2011.  For the reasons discussed below, the motion will be denied.

---

[1] At the hearing, Lonchar's counsel requested that the Court also grant partial summary judgment with respect to Claim Six insofar as that claim is based upon reporting violations.  Counsel did not give notice to the SEC prior to making this oral request, but asserted that the arguments with respect to Claim Six are identical to those presented with respect to Claims One, Two, and Five.  Given its disposition of Lonchar's motion, the Court need not determine whether counsel's request raises due process concerns.

**I. BACKGROUND**

The circumstances underlying this lawsuit are described in detail in this Court's order of July 29, 2010 ("July 29 Order") and need not be set forth in full here. In brief, the SEC brought this action against several former officers, directors, and executives of Veritas Software Corporation ("Veritas" or "the company") in 2007, alleging fraud and record keeping violations under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). Lonchar, the sole remaining defendant, served as Veritas's chief financial officer ("CFO") from April 1997 until he resigned in October 2002.

The claims against Lonchar are grounded in two distinct courses of conduct he undertook as CFO. First, the SEC accuses Lonchar and others of artificially inflating the company's revenue with respect to a September 2000 transaction in which Veritas agreed to increase the licensing fee it had quoted to America Online, Inc. ("AOL") by $20 million while simultaneously contracting to purchase $20 million worth of advertising from AOL. In 2003, Veritas announced that it would restate its financials relating to the AOL transaction. Second, the SEC accuses Lonchar of engaging in accounting manipulation in order to "smooth" revenue and earnings between 2000 and 2002. Lonchar allegedly: (1) manipulated the company's deferred revenue balances to make it appear that deferred revenue increased quarter-over-quarter; (2) directed that a portion of the company's earned professional service revenue go unrecognized so that license revenue appeared to be a larger percentage of total revenue; and (3) maintained excess quarterly accrued loss balances in order to establish a "cookie jar" reserve that could be released when needed to bump up the company's net income and earnings per share. In 2004, Veritas announced that it would restate its financials for the years 2001 and 2002, including the corresponding interim periods, and for the first three quarters of 2003 ("the 2004 Restatement"). The company's stock dropped significantly on this news.

In its July 29 Order, the Court granted in part and denied in part Lonchar's motion for partial summary judgment with respect to claims based upon the AOL transaction. Lonchar now seeks partial summary judgment with respect to certain claims based upon the "smoothing" allegations, in particular, claims under § 10(b) of the Exchange Act, § 17(a) of the Securities Act, and Rule 13b2-2 promulgated under the Exchange Act (Claims One, Two, and Five).

## II. LEGAL STANDARD

The standard applied to a motion seeking partial summary judgment is identical to the standard applied to a motion seeking summary judgment with respect to the entire case. *Urantia Foundation v. Maaherra*, 895 F. Supp. 1335, 1335 (D. Ariz. 1995). "Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Samuels v. Holland American Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011) (citing Fed. R. Civ. P. 56(a)). "In considering a motion for summary judgment, we must draw all reasonable inferences in favor of the nonmoving party." *Id*. "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

## III. DISCUSSION

This Court has held that to prevail on the claims that are the subject of this motion, the SEC must prove that the misstatements in question were material. *SEC v. Leslie*, No. C 07-3444, 2010 WL 2991038, at *28 (N.D. Cal. July 29, 2010). "Materiality depends on the significance that a reasonable investor would assign to the withheld or misrepresented information." *United States v. Reyes*, 577 F.3d 1069, 1075 (9th Cir. 2009) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). "To be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the 'total mix' of information made available.'" *Id*. (quoting *Basic*, 485 U.S. at 231-32). In a securities fraud action, materiality is a "fact-specific issue[]" that "should ordinarily be left to the trier of fact," although "summary judgment may be granted in appropriate cases." *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994) (internal quotation marks and citation omitted).

**A.   Lonchar's Evidentiary Objections**

Before turning to the merits, the Court will address Lonchar's evidentiary objections. First, Lonchar objects to the SEC's reliance upon deposition transcripts and investigative testimony transcripts on the basis that the SEC failed to submit a signed reporter's certification with each

3

1  transcript.[2]  The SEC represents that it is prepared to produce witnesses at trial who can testify from
2  personal knowledge as to the contents of the transcripts.  This representation is sufficient for
3  purposes of a motion for summary judgment.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th
4  Cir. 2003) (holding that a party opposing summary judgment need not produce evidence that would
5  be admissible at trial as long as the party could present the evidence in admissible form at trial).
6  Moreover, the Court notes that Lonchar himself has cited a number of the same deposition
7  transcripts to which he objects, that certain of the investigative testimony transcripts were
8  authenticated during depositions, and that the SEC has provided certifications of the remaining
9  transcripts in response to Lonchar's objection.

10  Lonchar also argues that a number of statements in the SEC's brief are not supported by the
11  cited evidence and therefore should be stricken.  The Court declines to strike material from the
12  briefs.  However, while the Court has considered all of the argument presented by both sides, the
13  Court has based its ruling on the motion on   the evidence in the record  .

14  Next, Lonchar asserts a lack of foundation for witness testimony regarding financial
15  documents where the witness did not prepare the documents.  "Personal knowledge, however, is not
16  strictly limited to activities in which the declarant has personally participated." *Washington Cent. R.*
17  *Co., Inc. v. Nat'l Mediation*, 830 F. Supp. 1343, 1353 (E.D. Wash. 1993).  "Based on personal
18  knowledge of the files and records, a declarant may testify to acts that she or he did not personally
19  observe but which are described in the record, including requests or statements by third persons
20  made to someone other than the declarant." *Id.*; *see also Londrigan v. FBI*, 670 F.2d 1164, 1174-75
21  (D.C. Cir. 1981) (FBI agent that reviewed file had personal knowledge sufficient to support
22  statements about certain aspects of an investigation in which he had not participated).

23  Lonchar contends that the company's restated financials and the outside auditor's
24  workpapers are inadmissible hearsay.  However, the records are admissible as business records
25  under Federal Rule of Evidence 803(6).  *See In re Homestore.com, Inc.*, No. CV 01-11115, 2011
26  WL 291176, at *5 (C.D. Cal. Jan. 25, 2011) (restated financials are business records under Federal

---

[2] Lonchar also argues that investigative testimony should be given less weight than deposition testimony.  The Court does not weigh evidence on a motion for summary judgment.  *See Wendt v. Host Internat'l, Inc.*, 125 F.3d 806, 810 (9th Cir. 1997).

4

Rule of Evidence 803(6)); *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288 DLC, 2005 WL 375313, at *8-9 (S.D.N.Y. Feb. 17, 2005) (restated financials and outside auditor's workpapers are business records). The case relied upon by Lonchar, *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254 (9th Cir. 1984), is distinguishable. In *Paddack*, the subject documents were special audit reports prepared in anticipation of litigation, not restated quarterly and annual reports or corresponding auditor's workpapers prepared in the ordinary course of business.

With respect to a particular workpaper from outside auditor KPMG, Exhibit 52, Lonchar makes the additional objection that the document should be stricken as illegible. The Court agrees that the paper copy of this exhibit is illegible. However, the SEC has electronically filed a copy of the document in "pdf" format that may be viewed on a larger scale to assist reading. Enlarging the pdf document renders the exhibit legible with respect to the relevant data.

Finally, Lonchar objects to certain of the SEC's citations on the ground that the SEC failed to provide pin cites. The SEC has rectified this omission in response to the objections.

Accordingly, all of Lonchar's evidentiary objections will be overruled.

**B.     Lonchar's Alleged Misconduct**

The SEC presents evidence that Lonchar engaged in three types of accounting manipulation between 2000 and 2002, discussed as follows:

**1.     Manipulation of Deferred Revenue Balances**

Both sides' experts describe deferred revenue as money that a company has collected before it is earned – for example, payment for products that have not yet been delivered. Such revenue is not recognizable under Generally Accepted Accounting Principles ("GAAP"); instead it is carried on the company's balance sheet as deferred revenue. The SEC presents the opinion of its accounting expert, Lee Seidler, that deferred revenue is an indicator of future sales: if the deferred revenue balance increases from quarter to quarter it indicates a likelihood of an increase in future sales, while if the balance declines it indicates a potential decline in future sales. Williams Decl., Exh. 19, Seidler Report, at 24. Douglas Newton, who was an assistant controller at Veritas during the period in question, testified that deferred revenue was one of the "key indicators" that Lonchar tracked. Williams Decl., Exh. 5, Newton Inv. Test., at 75-77. It was an item that Lonchar discussed

during analysts' calls. *Id*. at 77. Lonchar would state expressly to analysts that "deferred revenue is up sequentially" over the prior quarter. *Id*. In general, Veritas's reported results reflected a trend in which the deferred revenue balance increased quarter over quarter from 2000 through the second quarter of 2002. Opp., Appx. A.

In the second quarter of 2002, Newton informed Lonchar that deferred revenue would decrease from the prior quarter. Williams Decl., Exh. 5, Newton Inv. Test., at 74. Lonchar was upset that he had not been informed of this fact earlier. *Id*. at 74-75. He directed Newton to diverge from normal company practice and include in the deferred revenue balance items that had been billed but not actually paid. *Id*. at 75-76, 79-80, 87. Normally, Veritas calculated its deferred revenue balance by tallying all contracts for which the revenue was not yet "earned" and then subtracting unpaid contracts from that balance. Linsenmayer Decl., Exh. 9, Newton Depo., at 222-23. Lonchar changed this practice for the second quarter of 2002 because "he was trying to manage that [deferred revenue] number up." Williams Decl., Exh. 5, Newton Inv. Test., at 80. Newton passed Lonchar's directive on to a lower level finance employee, Thu Pham, who executed it. *Id*. at 87-88. According to the SEC's expert, Seidler, the resulting inclusion of unpaid items in the company's deferred revenue balance for the second quarter of 2002 violated GAAP. Williams Decl., Exh. 19, Seidler Report, at 25. Veritas's outside auditor, KPMG, caught the overstatement of deferred revenue and raised it at an audit signoff meeting, which was attended by Lonchar, Newton, and others. Williams Decl., Exh. 5, Newton Inv. Test., at 99-100. Because the monetary amount of the overstatement was relatively small – Newton remembers it being in the $5 million range, and KPMG's later restatement summary indicated that it was in the $7 million range – KPMG left it to the company to decide whether to correct the overstatement of deferred revenue. *See id*. at 100; Williams Decl., Exh. 22, KPMG Restatement Issue Summary, at KPMG 98992. Lonchar did not express any desire to do so. Williams Decl., Exh. 5, Newton Inv. Test., at 101. As a result, the deferred revenue balance for the second quarter of 2002 did not decrease relative to the prior quarter. *See* Appendix A to Opp.

6

### 2. Failure to Recognize Earned Professional Service Revenue

Veritas derived revenue primarily from two sources: license fees and professional service fees. Linsenmayer Decl., Exh. 38, 2004 Restatement, at 54-57. Lonchar paid close attention to the mix between license revenue and professional service revenue. Williams Decl., Exh. 6, Lucas Inv. Test., at 540-41. In at least one analysts' call, Lonchar stated that a higher percentage of service revenue resulted in a decrease in gross margin. Williams Decl., Exh. 11, Veritas Earnings Conference Call (July 16, 2002), at 4. In another analysts' call, he predicted that service revenue would constitute just over twenty percent of total revenue and would gain about half a percentage point of total revenue for each sequential quarter. Williams Decl., Exh. 10, Veritas Earnings Conference Call (Jan. 24, 2001), at 5. Before each quarter end, Lonchar articulated what percentage of total revenue he wanted to be license revenue and what percentage he wanted to be professional service revenue. Williams Decl., Exh. 5, Newton Inv. Test., at 114. When service revenue exceeded what Lonchar had predicted and what he wanted to see, he directed that billing for completed services be deferred into subsequent quarters. *Id*. at 114-15; Williams Decl., Exh. 6, Lucas Inv. Test., at 506-07. Seidler opines that this practice of "rolling forward" revenue such that it was not recognized in the period in which it was earned constituted a violation of GAAP. Williams Decl., Exh. 19, Seidler Report, at 23-24.

### 3. Excess Quarterly Accrued Loss Balances

"Under GAAP, a company must set up a loss contingency reserve if a future loss is both probable and reasonably estimable." *SEC v. KPMG*, 412 F. Supp. 2d 349, 364 (S.D.N.Y. 2006) (citing Statement of Financial Accounting Standards No. 5: Accounting for Contingencies ¶ 8 (Fin. Accounting Standards Bd.1975) ("FAS 5")). "When such a reserve is created, it is charged to current earnings." *Id*. at 365. Release of an accrual boosts current earnings by the amount of the accrual. *Id*. "When a reserve is created without a sufficient likelihood that the relevant expense will be incurred, it permits a company to draw on the reserve to cover expenses for which the reserve was not created and thereby artificially boost its earnings in subsequent reporting periods." *Id*.

Lonchar had a practice of directing that accruals remain on a "cushion schedule" even after the accrual no longer was necessary or supportable. Williams Decl., Exh. 5, Newton Inv. Test., at

7

160. He micro-managed the cushion schedule: "he would say yes, book that, don't book that, or whatever." *Id*. at 163. Newton had the impression that Lonchar constantly altered the accrual numbers in order to achieve a desired result on the company's financial statements. *Id*. at 167-68. KPMG reached the same conclusion: "In certain instances, accruals were recorded in historical periods and released in later periods instead of the period when the accruals were deemed no longer appropriate." Williams Decl., Exh. 23, KPMG Restatement Issue Summary, at KPMG 115318. KPMG auditor Chris Dyer concluded that the purpose of the cushion schedule was "[s]o that if management's numbers . . . for example, their earnings per share were not going to meet analysts' expectations, it was available there for them to take some out and put it in the income, so that earnings per share would meet analysts' expectations." Resp. re Objs., Exh. 5, Dyer Depo. at 279. The cushion schedule also was referred to as the "Ted" schedule, so named after one of Veritas's in-house attorneys following an employee's comment that "[i]f anybody finds these cushion schedules, we're going to need an attorney." *Id.*

### 4. Restatement of Financials

Lonchar repeatedly certified in representation letters that Veritas's financial statements for 2000 through 2002 were in conformity with GAAP and did not contain any fraud or intentional misstatements. In 2004, Veritas restated its financials for the years 2001 and 2002, including the corresponding interim periods, and for the first three quarters of 2003. Linsenmayer Decl., Exh. 38, 2004 Restatement. Among other things, the restatement corrected misreported deferred revenue and professional service revenue, and reversed improper accruals. *Id*. The company's stock dropped significantly on this news.

### C. Materiality of Lonchar's Misrepresentations

Lonchar contends that the SEC cannot prove that any of the above-described misstatements were legally "material." As noted above, "[t]o be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the 'total mix' of information made available.'" *Reyes*, 577 F.3d at 1075 (quoting *Basic*, 485 U.S. at 231-32).

Lonchar argues that taken separately or in the aggregate, the alleged accounting manipulations were quantitatively negligible. Of the 200 adjustments that went into the 2004 Restatement, sixty relate to the alleged "smoothing" practices described above. Mot., Appx. 1. While the parties dispute the precise calculations that should be used in quantifying the effect that the alleged manipulations had on Veritas's financials, it appears that even under the SEC's approach there was little or no measurable effect on the company's bottom line.[3] Lonchar directs the Court to a number of cases in which minor impacts to revenue and earnings were deemed immaterial as a matter of law. *See, e.g.*, *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (omission from prospectus of distribution fees that accounted for only 0.4% of company's annual revenue deemed immaterial as a matter of law); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003) (inflation of total revenues by 0.3% was immaterial as a matter of law); *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 720-21 (E.D. Va. 2003) (omission of increased costs totaling 3.25% of company's net annual earnings was immaterial as a matter of law).

Even accepting for purposes of the present motion that the effect of the alleged manipulations was quantitatively small, the real thrust of the SEC's claims is that the manipulations were *qualitatively* material because they altered indicators relied upon by analysts and the market in evaluating Veritas for investment. "[T]he concept of 'materiality' is not limited to a percentage of a company's total profits, but rather requires *assessment* of qualitative and quantitative factors so that even quantitatively small amounts can still present a materially misleading picture of a company's health." *SEC v. Yuen*, No. CV 03-4376MRP(PLAX), 2006 WL 1390828, at *37 (C.D. Cal. Mar. 16, 2006) (emphasis in original). "[V]arious '[q]ualitative factors may cause misstatements of quantitatively small amounts to be material.'" *Ganino v. Citizens United Co.*, 228 F.3d 154, 163 (2d Cir. 2000) (quoting SEC Staff Accounting Bulletin ("SAB") No. 99, 64 Fed.Reg. 45150, 45152 (1999)). In *Ganino*, the appellate court reversed the district court's ruling that a misrepresentation

---

[3] The SEC argues that certain aspects of the manipulation may be considered material under the five percent "rule of thumb," *see SEC v. Woodruff*, 778 F. Supp. 2d 1073, 1085 (D. Col. 2011), pointing to evidence that 5.5% of actual service revenue was unreported in the first quarter of 2001, and that net income was overstated by 6.6% in the fourth quarter of 2001 as a result of a transfer of $6.4 million from the cushion schedule to cover expenses that ordinarily would have been charged to earnings. *See* Williams Decl., Exh. 19, Seidler Report, at 23-24; Opp., Appx. A, at 5-6. However, the SEC does not dispute that the manipulations in question had little or no quantitative effect on the company's financials overall.

1  implicating fees totaling 1.7% of the company's total revenue was immaterial as a matter of law. *Id*.
2  at 162. The court noted that the Supreme Court has rejected a bright-line numerical rule, *id.*
3  (quoting *Basic*, 485 U.S. at 236 & n.14), and it held that a misrepresentation of even such a
4  relatively small amount could be material depending upon the circumstances of the particular case,
5  *id*. at 165. Other courts have reached similar conclusions. *See, e.g.*, *SEC v. Fuhlendorf*, No. C09-
6  1292, 2011 WL 999221, at *7 (W.D. Wash. Mar. 17, 2011) ("quantifying, in percentage terms, the
7  magnitude of a misstatement is only the beginning of an analysis of materiality") (quoting SAB No.
8  99); *United States v. Hawkins*, No. CR 04-106 MJJ, 2005 WL 1660984, at *19 (N.D. Cal. July 11,
9  2005) ("An error that might not rise to the level of quantitative materiality might still have an impact
10 on software revenue growth or earnings per share such that it would be meaningful to readers of the
11 financial statements, rendering the error qualitatively material."). Evidence of materiality "may be
12 particularly compelling where management has intentionally misstated items in the financial
13 statements to 'manage' reported earnings." *SEC v. Escala Group, Inc.*, No. 09 Civ. 2646 (DLC),
14 2009 WL 2365548, at *9 (S.D.N.Y. July 31, 2009) (quoting SEC Staff Accounting Bulletin No. 99,
15 64 Fed. Reg. 45150 (1999)).

16 Here, Lonchar's materiality argument presents a very close question. The numbers in
17 question are relatively small, and the SEC does not present particularly compelling evidence that the
18 public's perception of the company was affected by the alleged manipulations. As Lonchar points
19 out, the SEC does not offer testimony from any investor or broker on this issue. Nonetheless, the
20 Court concludes that considering the evidence as a whole and reasonable inferences that may be
21 drawn therefrom, a finder of fact could conclude that analysts and investors viewed Veritas's
22 deferred revenue trend, mix of license and service revenue, and ability to meet expectations with
23 respect to earnings per share, as significant indicators of the company's health. Thus, it is possible
24 that a reasonable finder of fact could conclude that Lonchar's "smoothing" of the reported data
25 relevant to these indicators was qualitatively material even if the numbers in question were
26 quantitatively small.

27 Lonchar argues that because the misrepresentations in question are quantitatively negligible,
28 the SEC is asking the trier of fact to infer materiality wholly from the stock drop following the 2004

Restatement. He observes correctly that when complex factors are at play, "a drop in stock price, by itself, does not establish that the decline was caused by the revelation of an earlier misrepresentation." *See United States v. Schiff*, 538 F. Supp. 2d 818, 835 (D.N.J. 2008). In certain circumstances, an expert may be necessary to help a jury sort through the various factors that may have contributed to the stock drop. *See United States v. Singer*, No. 9:05-cr-00928, 2010 WL 146165, at *4 (D.S.C. Jan. 8, 2010). Lonchar asserts that the SEC cannot present the required expert evidence in this case, because the Court has excluded the testimony of the SEC's expert on legal materiality, Jeffrey Davis, *see SEC v. Leslie*, 2010 WL at *16, and it has ruled that the SEC's accounting expert, Seidler, may not opine on the subject of legal materiality, *see id.*, 2010 WL at *11.

However, as is illustrated by the discussion above, this is not a bare stock drop case. Moreover, while the Court has ruled that Seidler "may not testify as to legal concepts, the legal interpretation of case law and statutes, or whether specific conduct was fraudulent, intentional, or misleading in the legal sense," this ruling does not impact the admissibility of Seidler's testimony for the purpose of helping a jury understand what Lonchar did and why it was significant from an accounting perspective. Although it is a close call, the Court concludes that this is not an appropriate case in which to deviate from the general rule that materiality is a fact-specific issue that "should ordinarily be left to the trier of fact." *See Kaplan*, 49 F.3d at 1375.

## IV. ORDER

Good cause therefor appearing:

(1) Lonchar's evidentiary objections are OVERRULED; and

(2) the motion for partial summary judgment is DENIED.

DATED: January 13, 2012

JEREMY FOGEL
United States District Judge